732 A.2d 333

**Mary J. WANKEL, et al.**

v.

**A&B CONTRACTORS, INC., et al.**

**No. 986, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

July 1, 1999.

132

Gerald I. Holtz (Holtz & Foret, LLC, Chevy Chase, Richard E. Schimel, Budow & Noble, P.C., Bethesda, William A. Simmons and Butler & Simmons, Wheaton, on the brief), for appellants.

Kevin P. Kennedy (William C. Davis, III, Ashley J. Gardner and Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on the brief), Rockville, for appellee, D.R. Horton.

Joseph F. Zauner III (Mason, Ketterman & Morgan, on the brief), Baltimore, for appellee, Genstar.

David D. Hudgins, Alexandria, VA, for appellee, Seneca.

Paul H. Ethridge, Amy Leete Leone and McCarthy, Wilson & Etheridge, on the brief, Rockville, for appellee, Wright.

Patrick G. Cullen and Rollins, Smalkin, Richards & Mackie, LLC, on the brief, Baltimore, for appellee, A & B Contractors, Inc.

Argued before WENNER, HOLLANDER, and PAUL E. ALPERT, (Retired, Specially Assigned) JJ.

HOLLANDER, Judge.

This complex tort case arises from a gas explosion that destroyed one home and damaged another in a Gaithersburg subdivision known as "the Kentlands." The explosion spawned litigation involving multiple parties and a host of claims, cross-claims, and third party claims.

Early on the morning of January 21, 1994, Mary J. Wankel, appellant, and her fiancé, Daniel I. Wilcox, appellant, were sleeping in the upstairs bedroom of Wankel's home, located at 110 Beckwith Street, when they were awakened by an explosion. Wilcox ran to the landing on the second floor and discovered that the first floor of the house was engulfed in flames. The couple soon realized that the only means of escape was through the bedroom window. Wankel and Wilcox were injured when they jumped from the second story to the frozen ground below. As they watched from a neighbor's porch, their house burned to the ground. The explosion also damaged the home of Wankel's neighbors, Karen and George Gouzoulis. Ms. Gouzoulis, appellant, was injured by the fire.

As a result of the explosion, Wankel's insurer, State Farm Fire and Casualty Co. ("State Farm"), appellant, paid Wankel $253,264.08 under Wankel's homeowner policy for the damage to her residence. In addition, State Farm paid $163,950.00 to Wankel for personal property losses, and $25,943.71 in "additional living expenses." Nationwide Mutual Fire Insurance Co. ("Nationwide"), appellant, the Gouzoulis's insurer, paid $11,699.65 for repairs to the Gouzoulis's dwelling, located at 102 Kent Oaks Way.

On January 16, 1997, Wankel, Wilcox, Ms. Gouzoulis, State Farm, and Nationwide filed a five-count complaint[1] in the Circuit Court for Montgomery County against various defendants who were involved in the construction of the Wankel home. Specifically, appellants sued the following entities: D.R. Horton, Inc. ("Horton"), appellee and cross-appellant, the general contractor of the Wankel home; Great Seneca Development Corporation ("Great Seneca"), cross-appellee, the developer of the Kentlands Community; Wright Excavating, Inc. ("Wright"), cross-appellee, a subcontractor that performed excavation and grading work on the property for Horton; A &

---

1. Count I of appellants' complaint sought one million dollars in damages for Wankel's injuries. Count II demanded $500,000.00 on behalf of Wilcox. County III sought $250,000.00 in damages for Ms. Gouzoulis's injuries. Counts IV and V were lodged on behalf of the insurers to recover for the payments to their insureds.

B Contractors, Inc. ("A & B"), appellee and cross-appellee, a subcontractor that repaired the silt fence [2] around the property for Horton; Redland Genstar, Inc. ("Genstar"), cross-appellee, a subcontractor that paved an alleyway near the Wankel home for Great Seneca and paved a driveway for Horton; and Triangle Landscapers, Inc. ("Triangle"). In their suit, appellants claimed that a wooden stake used for the silt fence was driven into the ground during the construction process, puncturing a natural gas pipeline. According to appellants, gas then leaked from the pipeline, made its way into the house, and exploded when it came in contact with an unknown heat source.

In March and April of 1997, the defendants lodged a flurry of cross-claims.[3] Of particular importance to this appeal, Horton filed cross-claims against Wright, A & B, Great Seneca, Genstar, and Triangle, seeking recovery on theories of indemnity and contribution. Thereafter, Horton impleaded Keith Dodson,[4] individually and doing business as Ravenwood Associates ("Ravenwood"), in connection with the installation of the silt fence on the Wankel property. Dodson answered Horton's third party complaint on October 10, 1997. Appellants explain that by the time they realized Dodson was the original installer of the silt fence, they could not amend their

---

**2.** A silt fence is "a sediment barrier filter cloth which is a kind of fiberglass mesh through which [water] would pass trapping the sediment that comes with it." *City of New York v. Anglebrook Ltd. Partnership*, 891 F.Supp. 908, 918 n. 18, *aff'd*, 58 F.3d 35 (1995).

**3.** With the exception of Triangle, each defendant filed cross-claims against the various co-defendants. On March 10, 1997, Genstar filed cross-claims against Wright, Horton, A & B, Triangle, and Great Seneca. On March 17, Great Seneca responded with cross-claims against Genstar, Wright, A & B, Horton, and Triangle. On March 25, 1997, Horton filed cross-claims against each co-defendant. On April 3, 1997, A & B joined the fray with cross-claims against Great Seneca and Horton. Finally, Wright filed cross-claims against each defendant on April 7, 1997.

**4.** "Dodson" is occasionally spelled "Dobson" in the pleadings. Because Dodson spelled his name with a "d" in his affidavit, we shall do the same.

complaint to add him as a defendant, because the statute of limitations had expired as to Dodson. Nevertheless, they contend that Horton is responsible for Dodson's alleged negligence.

By July 1997, Triangle was dismissed from the case, after it filed a motion for summary judgment that was not opposed. Triangle had claimed that its work on the Wankel property was limited to planting shrubs and mulching a flower bed in the front yard.

The court limited the first phase of discovery to the issue of liability, with a completion date of January 30, 1998. In a Second Amended Scheduling Order entered on January 5, 1998, the court also ordered that "Liability Motions, except for Defendant, Ravenwood, shall be filed by Jan. 30, 1998." Thereafter, on January 28, 1998, appellants moved to voluntarily dismiss Great Seneca, Wright, and Genstar, which Horton opposed. Defendants Great Seneca, Wright, Genstar, Horton, and A & B subsequently filed motions for summary judgment.

In an order dated March 25, 1998, the circuit court granted appellants' motion to dismiss. The court also granted summary judgment in favor of Horton and A & B, concluding that appellants failed to prove that either party proximately caused the explosion. It also granted summary judgment in favor of Great Seneca, Wright, and Genstar with regard to the cross-claims of Horton and A & B.

On appeal, appellants present a single issue:

Did the plaintiffs present sufficient evidence to create a question of fact as to whether Horton and/or A & B's conduct was a proximate cause of their injuries and damages?

Horton noted a cross-appeal, challenging the court's denial of its motion for summary judgment, because appellants failed to present expert testimony as to the standard of care of a contractor. Horton also complains about the dismissal of its cross-claims, and seeks to "preserve a right to revive the

cross-claims if necessary after resolution of this appeal." It presents the following question:

> Did the lower court correctly rule that Plaintiffs presented legally sufficient evidence (including expert testimony) to permit a jury to conclude that Defendant Horton breached a duty of care owed to Plaintiffs?

In reply to Horton's cross-appeal, Wright, Great Seneca, Genstar, and appellants (as cross-appellees) filed separate briefs raising various issues of their own. We have set forth below the issues raised by each cross-appellee:

Cross–Appellee Wright:

> I. Since there was no evidence from which a trier of fact could reasonably infer that Wright excavating was responsible for driving "the stake" down into the ground, was the trial court's decision to grant Wright Excavating's motion for summary judgment on D.R. Horton's cross-claims legally correct?
>
> II. Was the trial court's decision to grant Wright Excavating's motion for summary judgment on D.R. Horton's cross-claim for indemnification legally correct?
>
> III. Was the trial court's decision to grant Wright Excavating's motion for summary judgment on D.R. Horton's cross-claim for contribution legally correct?

Cross–Appellee Great Seneca:

> I. Whether the appeal of the court's ruling on Horton's cross-claim against Great Seneca is properly before this court.
>
> II. Whether the court ruled that Horton's cross-claim against Great Seneca is moot as a result of its granting summary judgment to Horton on plaintiff's claims.

Cross–Appellee Genstar:

> Did the lower court properly enter summary judgment in favor of Redland Genstar, Inc.?

Cross-Appellees Wankel, Wilcox, Gouzoulis, State Farm, and Nationwide:

I. Did the trial court correctly conclude that the Plaintiffs had produced evidence concerning Horton's duty and its breach of that duty?

II. Did the trial court correctly conclude that the Plaintiffs' standard of care expert was qualified to express the opinions elicited from him?

In addition, Great Seneca, Genstar, and Wright have moved to dismiss Horton's cross-appeal. Great Seneca and Genstar contend that the court granted summary judgment as to Horton's cross-claims on substantive grounds, not merely because Horton's cross-claims became "moot" when the court granted judgment in Horton's favor with regard to appellants' claims. Citing Md. Rule 8–602(a)(7), which permits dismissal of an appeal when a party fails to submit a timely brief, they urge dismissal of Horton's cross-appeal, for failure to address the substantive grounds on which the court resolved the cross-claims. For its part, Wright seeks dismissal of Horton's cross-appeal, pursuant to Rule 8–504(a)(5), because Horton failed to address the substance of the court's ruling on summary judgment as to Wright. On January 22, 1999, less than two weeks before oral argument, Horton filed a Motion for Leave to Supplement Brief. Great Seneca, Wright, and Genstar all oppose Horton's motion to supplement. That motion is pending.

For the reasons that follow, we shall affirm. To be sure, the occurrence was extremely unfortunate. But, a plaintiff cannot recover based on sympathy. We agree with the trial court that appellants failed to show that any of the defendants proximately caused appellants' injuries. It follows that we need not consider the issues relating to Horton's cross-appeal or Horton's motion to supplement its original brief.[5]

---

5. We note that Horton's "supplement" would add nineteen pages of argument and twenty-six pages of new appendix material to the forty-nine page brief originally submitted to this Court. The rules do not authorize the filing of a supplemental brief. We also observe that the

## Factual Background

Our factual recitation derives from the pleadings and the evidence produced in connection with the motions filed by appellees and cross-appellees. To the extent there is any factual dispute, we have cast the facts in the light most favorable to appellants.

In March 1992, Wankel entered into a contract with Horton to purchase a "Betsy Ross" model home, to be constructed on Lot 27A of the "Kentlands" development in Gaithersburg. It is unclear, based on the record, whether Horton acquired the lot from Joseph Afandre, the original developer of the Kentlands, or from Great Seneca.[6] In any event, on June 23, 1992, Horton applied, as the general contractor, for a building permit to construct the Wankel house.

Wankel's house faces Beckwith Street; the garage is located on the southeastern corner of her property. Lot 27A is rectangular in shape, 99 feet long and 46 feet wide, and is situated so that its narrower, northern end faces Beckwith Street. A paved common-use alley runs along the 99 foot southern edge of the lot, and then turns along the rear edge of the property, providing access to the garages of homes on Beckwith Street. Redland Genstar, a subcontractor for Great Seneca, paved the alley in October 1991.

In July 1992, Horton hired Wright to excavate and backfill the foundation of the Wankel house and garage. In its answers to appellants' interrogatories, Wright averred that it

dates of filing of the cross-appellees' briefs preceded the date of Horton's first reply brief. Thus, Horton could have responded to the cross-appellees' contentions in its first reply brief. Because the Maryland Rules make no provision for a cross-appellant to submit more than one reply brief to a cross-appellee's brief, we would not permit Horton to "supplement" his brief in response to arguments made in the cross-appellees' briefs. *See* Md. Rule 8–502(a)(6).

**6.** In his deposition, Richard Richter, Horton's corporate designee, testified that the Kentlands lots were purchased in two groups: one from Alfandre and one from Great Seneca. Richter could not recall whether lot 27A was purchased in the Alfandre group or the Great Seneca group.

spent two days in July 1992 working on Lot 27A; Wright spent one day "digging the foundation and stockpiling dirt on an adjacent lot with a 953 Front End Loader ....", and another day placing dirt around the foundation of the house, using the Front End Loader to "rough grade the yard...." Invoices submitted to the court by appellants indicate that Wright's initial work was completed on July 8, 1992, and the backfill operations were completed on July 26, 1992. Wright claimed that it returned to Lot 27A on November 19, 1992, in order to "final grade the yard for seeders." Then, on November 24, 1992, Wright loaded excess dirt from lots 27 and 28 onto trucks that were parked on Beckwith Street.

On July 14, 1992, during the course of Wright's work, Horton's site superintendent, John Buffet, contacted "Miss Utility" to advise that it intended to excavate Lot 27A. He made the report pursuant to the "underground facilities" provision of the Maryland Code. *See* Md.Code (1957, 1991 Repl.Vol.), Art. 78, § 28A. A computer printout memorializing Buffet's call indicates that he gave notice that Horton intended to build a garage on the southeastern corner of the lot.[7]

Invoices submitted by appellants indicated that Dodson installed 320 feet of silt fence on Lot 27A on August 3, 1992, and an additional 50 feet of silt fence on September 15, 1992. The invoices do not specify where within Lot 27A the fencing was installed. At his deposition, Dodson testified that Buffet, Horton's site manager, instructed him to install the fence along the edge of the asphalt alleyway on the long side of the lot, in order to prevent soil erosion into the alleyway. At the time, the area was marked by yellow flags indicating an underground gas line. Dodson testified that while he did not know how deep the gas lines were located in this particular

---

7. If the invoices submitted by appellants accurately reflect the dates on which Wright's services were performed, we observe that Buffet's call to Miss Utility could only have informed the authorities of the backfill operation, not the excavation of the foundation. This is because Buffet gave the requisite notice on July 14, 1992, but Wright's initial work was completed on July 8, 1992.

area, gas lines, in his experience, are generally buried three feet underground. The following portion of Dodson's deposition testimony, which was submitted to the court by the appellants, is pertinent:

COUNSEL FOR APPELLANTS: I may have asked you this: Mr. Buffett told you where to put the silt fence?

DODSON: Yes.

* * *

COUNSEL FOR APPELLANTS: Did he tell you to put it up against the alley, the paved alley?

DODSON: Yes.

COUNSEL FOR APPELLANTS: Okay. And you were aware at the time that you were putting it over ostensibly what was the gas line; is that correct?

COUNSEL FOR DODSON: Objection. I'm—I think that's kind of a trick question, because—wait a minute. You're indicating that he's ostensibly putting it over the gas line.

Why don't you ask him how far the gas—the gas line was from the edge of the asphalt, at least as far as the markings indicated to him? Because you're having him put it over.

* * *

COUNSEL FOR APPELLANTS: Did you know exactly where the gas line was located when you put that silt fence up?

COUNSEL FOR DODSON: Go ahead. You can answer.

DODSON: Okay. Yeah.

COUNSEL FOR APPELLANTS: Where was it located?

DODSON: On the ground right there.

COUNSEL FOR APPELLANTS: Right there next to the alleyway, correct?

DODSON: Yes.

* * *

COUNSEL FOR APPELLANTS: Did you know generally where [the gas line] was—

DODSON: Yeah.

COUNSEL FOR APPELLANTS: —beneath the ground? Where?

DODSON: Where the little yellow marks were.

COUNSEL FOR APPELLANTS: All right. And did you know generally how deep it was in the ground?

DODSON: Yeah.

COUNSEL FOR APPELLANTS: How deep?

DODSON: Approximately three feet.

COUNSEL FOR APPELLANTS: How do you know that?

DODSON: Because I've been doing it for 15 years and I've seen a million of them.

Dodson further testified at his deposition that the silt fence stakes that he used measured 1" × 2" × 42". Later, Dodson averred, in an affidavit, that he "may have also installed silt fence across the rear of Lot 27A." Several other witnesses, including Wankel, corroborated that the silt fence encompassed the rear portion of the property.

On October 23, 1992, Horton hired A & B to perform repairs to the silt fence that Dodson had previously installed. Tom Atkins and Burt Leffingwell, employees of A & B, worked on the repairs for Lot 27A. At his deposition, Atkins testified that A & B used stakes measuring 2" × 2" × 42". He also said that silt fence stakes generally come already stapled to the silt fencing with one and one-half inch staples. Further, he estimated that when a silt fence stake is driven into the ground, it reaches a depth of approximately ten inches. Ordinarily, A & B's stakes are made of a hard wood, such as oak, but the wood type varies depending on what is available on the market. Atkins also stated that, as far as he knew, A & B was not required to contact "Miss Utility" before installing silt fencing.

Atkins testified that, on occasion, A & B is retained to repair a "blowout" of silt fencing. Atkins explained:

If the silt fence is, say, blown out—what I mean by blown out is, there's been heavy runoff, and the silt fence itself is bellied, sometimes I have to get in there and dig out the

area, throw it back, disperse it so the silt fence is not weakened, and maybe go in and put a stake there, and drive the stake down and then staple the stuff back up.

Then other times the silt fence may be torn. Say two pieces are torn, torn apart and laying there, then we may have to put in a stake there, put the two together, and staple it back up.

Leffingwell recalled that A & B performed a repair of a "blowout" in the rear left corner of Lot 27A. Leffingwell testified that the portion of the fence he repaired was "right along the edge of the asphalt" of the paved alleyway.

On a date not entirely clear from the record, Horton arranged for removal of the silt fencing. Robert Richter, Horton's corporate designee, could not recall whether the fencing was removed before or after Wankel moved into the house, nor could he remember who performed the removal. Richter testified that Horton would have utilized a "labor service" for the work.

Wankel moved into her home on November 30, 1992. More than thirteen months later, on January 21, 1994, the house was destroyed by the explosion and fire that we previously described. At the time of the accident, the temperature was quite cold and the ground was frozen.

After the explosion, representatives of the Montgomery County Fire Marshal's office, Washington Gas Company, and an investigator from the Maryland Public Service Commission's Gas Pipeline Safety Program, responded to the scene. Public Service Commission investigators took "bar hole readings"[8] of the property, which indicated that natural gas had permeated the ground around the house. Representatives of Washington Gas conducted "pressure tests" of the gas lines that serviced 110 and 114 Beckwith Street. The pressure

---

8. "Bar hole readings" are a method of measuring the level of natural gas distribution in the ground. A representative of Washington Gas testified in a deposition that bar hole readings are typically taken no deeper than eighteen inches below the surface, in order to avoid the gas pipeline.

tests indicated a leak from a two inch plastic distribution line under the rear alley. When the area around the suspected leak was excavated, the workers discovered a 3/4" hole in the top of the pipe, which was buried at a depth of 39" below the surface. They also discovered a wooden stake in the ground at a depth of 34 inches, which measured 2" × 2" × 38". The stake was located just outside the boundary of Wankel's property, next to the paved alleyway.

A "Gas Pipeline Failure Investigation" report prepared by the Public Service Commission stated:

> 3/4" hole in top of pipe made by 1.5" by 1.5" sharpened wooden stake. Pipe depth 39". Stake was measured at a depth of 34" during excavation, but had already been disturbed by backhoe and subjected to air pressure in pipe.

The report drew the following conclusion:

> Freezing of the ground probably moved the stake upward away from the gas pipeline allowing natural gas to escape from the pipe. The ground temperature was 32 F at the installed pipe depth of 39". The gas migrated under the garage slab and porch slab into the house and was ignited by an unknown source.

At his deposition, William Hinde, a corporate designee of the Washington Gas Light Company, described the process by which the stake was unearthed:

> COUNSEL FOR HORTON: Why don't you just tell me, if you can, how the gas company excavated the stake that day.
>
> HINDE: Once we had determined the most probable location of—of the leak, we excavated—we took the very first four to six inches up with—
>
> COUNSEL FOR HORTON: Four to six inches of what?
>
> HINDE: Soil, dirt, ice, gravel, earth materials, up with a backhoe. And then the remainder of the excavating was done by hand with using—by hand—using pneumatic air tools, because the ground was so hard.

\* \* \*

COUNSEL FOR HORTON: When you removed the first four to six inches of earth material with the backhoe, was the stake visible at that time?

HINDE: No, it was not.

COUNSEL FOR HORTON: So the stake was completely underground; is that correct?

HINDE: Yes.

COUNSEL FOR HORTON: Do you recall at what point the top of the stake became visible?

HINDE: We had excavated down approximately a foot and a half or so. And what you do is you start with a small hole and you work your way out using both air tools and a manual tunneling bar. And as they were knocking the bank down, the stake became visible.

\*　　\*　　\*

In excavating we took the first four to six inches up. We expanded the hole. And in expanding the hole we moved over into ground that had not been previously disturbed with the backhoe and knocked—sheared that wall off. It's a common excavating practice. And in shearing that wall down is when we came upon the stake.

COUNSEL FOR HORTON: Okay. So the earth material you removed with the backhoe was not over top of the location where you found the stake?

HINDE: It was not directly over.

COUNSEL FOR HORTON: All right. I'm with you. So, actually, the stake was uncovered by the use of digging bars and shovels when you were taking down the wall of the hole you were trying to create?

HINDE: Yes.

\*　　\*　　\*

COUNSEL FOR HORTON: And I assume that you eventually hand dug all the way down until you got to the depth of the gas line; is that correct?

HINDE: Yes.

COUNSEL FOR HORTON: Were you literally standing over the hole when the gas line was unearthed?

HINDE: Yes.

COUNSEL FOR HORTON: Did you observe the stake actually sticking in the gas line?

HINDE: No, I did not.

COUNSEL FOR HORTON: Did anybody present at the scene tell you that the stake was actually sticking in the gas line?

HINDE: No, they did not.

When asked if he knew of any similar incidents in which a stake has been driven into a plastic gas line, Hinde responded: "It has—it has happened before." But, Hinde was unable to specify when or how often he had observed the phenomenon.

In its report, the Montgomery County Fire Marshal's office concluded that "the fire was on the first floor, based on the interviews of neighbors and the observation of the writer on his arrival...." Further, the report indicated that "the cause was a natural gas leak."

Walter Rothfuss, of Rothfuss Engineering Co., investigated the accident on behalf of Washington Gas. In a report completed on April 21, 1994, Rothfuss concluded that the gas leak was caused by "the penetration of a line by a wooden stake most probably used as a *grade* stake." (Emphasis added). Rothfuss wrote:

Weather conditions on the day of the incident, and for some days prior to the fire were extreme. Single digit temperatures were common. There was an ice cover over the area. It was noted that the temperature of the soil at the depth of the distribution line was at freezing (32 degrees F). This condition would affect the flow of gas leaking from the distribution line. Under less frigid conditions the gas would naturally rise, find its way through the soil, and be dispersed in the atmosphere. When the moisture in the ground has frozen and the ground has an ice covering, the

gas is prevented from percolating up through the soil and seeks the path of least resistance through the soil. It is quite possible that this path was along the electric, telephone or CATV lines which lead from the area where the stake was discovered toward the SW elevation. From this point the gas could have entered the foundation of the structure by seepage through the foundation wall, or entering through the foundation drainage system into the basement sump. From this point it would migrate through the house.

Ignition of the migrating gas could be accomplished by any of the various naturally occurring sources of ignition found in the home. Any electrical arc from contacts on motors, or standing pilots on gas appliances, or even furnace thermostats would suffice.

It was discovered that the gas distribution line under the alley at the rear of the structure had been penetrated by a wooden stake. *The length of this stake and the attached piece of black plastic material indicates that this stake was at one time used for silt fencing.* It was also reported by Dr. Millman that a silt fence was indeed placed in the alley. This was the only leak site found for natural gas in this area, which was verified by pressure testing after the leak was repaired.

The Montgomery County Soil Conservation Department states that the erosion control (silt) fencing is required to be 2 feet wide on a 36 inch stake. It further requires that 4 inches of the fencing fabric should be placed below grade, which results in a 16 inch penetration of the surface by the stake. *Since there was approximately 27.5 inches of soil covering the distribution line under the asphalt and gravel sub-base it is improbable that this leak was the result of the placement of the silt fence unless there had been a substantial fill placed prior to the final grading or the stake had been driven deeper underground my some other means.*

(Emphasis added).

Rothfuss was later named an expert for the appellants. During his deposition, Rothfuss testified "at one time," the

"offending stake" found at the scene was a silt fence stake, because it had a "small fragment of silt fence fabric still attached by a staple". Indeed, a photograph attached by appellants to their opposition to Horton and A & B's motion for summary judgment depicts strands of fabric affixed to the wooden stake recovered from the scene. Rothfuss theorized, however, that the stake may have been utilized as a grade stake sometime after its use as a silt fence stake. When asked if he would state an opinion at trial as to whether the stake was used as a silt fence stake immediately prior to perforating the gas line, Rothfuss responded that he would not.

Rothfuss conceded that, despite the conclusion stated in his written report, he could not opine as to how the stake penetrated thirty-nine inches below the surface. The following testimony is relevant:

HORTON'S COUNSEL: [A]re you going to opine in this case that [the stake] was serving as a silt fence stake immediately prior to perforating the gas line?

ROTHFUSS: No, because it apparently had not. There was only a small fragment of silt fence fabric still attached by a staple to the stake.

\* \* \*

HORTON'S COUNSEL: Do you have an opinion, sir, as to the likelihood that the stake identified on page ten of your report was or was not serving as a silt fence stake immediately prior to it perforating the line?

ROTHFUSS: That, I don't know.

HORTON'S COUNSEL: And you'll state no opinion at trial on that subject?

ROTHFUSS: That's correct, I will not.

\* \* \*

HORTON'S COUNSEL: *And you have no idea how [the stake] got down to the 39 inches below grade where it was found on the day after the fire?*

ROTHFUSS: *I agree.*

HORTON'S COUNSEL: *And you'll state no opinion one way or the other in that regard at trial?*

ROTHFUSS: *That is not my intent.*

HORTON'S COUNSEL: *In other words, you will not?*

ROTHFUSS: *I will not.*

\* \* \*

HORTON'S COUNSEL: During the course of your developing your opinions in this case, were you asked to consider anything in regard to relative probabilities between, say, the stake being driven into the ground by some kind of piece of equipment or being excavated to the gas line and left in the ground in some backfill scenario? Were you asked to consider either of those?

ROTHFUSS: No.

HORTON'S COUNSEL: *Were you asked to consider anything in regard to how that stake got in close proximity and perforated that gas line?*

ROTHFUSS: *That's something everybody would like to know, but no, I haven't been asked to do that.*

\* \* \*

HORTON'S COUNSEL: In fact, that's something you were asked to determine by the gas company and were unable to?

ROTHFUSS: We followed a convoluted paper trail as far as we could. We were burning up a lot of money. We told our client that this was getting nowhere.

HORTON'S COUNSEL: *And your conclusion was, at the end of that process, that it was indeterminate?*

ROTHFUSS: *Yes.*

On January 28, 1998, two days before the close of discovery and liability motions, appellants sought leave to voluntarily dismiss Genstar, Great Seneca, and Wright, pursuant to Md. Rule 2–506(b). Horton opposed the dismissal, however.[9] The

---

**9.** Maryland Rule 2–506(a) permits a plaintiff to dismiss an action without leave of court "(1) by filing a notice of dismissal at any time before the adverse party files an answer or a motion for summary

motion to dismiss was still pending before the court when, on January 30, 1998, Horton and A & B filed motions for summary judgment, each seeking judgment as a matter of law as to appellants' claims and the co-defendants' cross-claims. On the same day, Great Seneca filed a motion for summary judgment against Horton and A & B. It argued, *inter alia,* that it was not liable to Horton or A & B for contribution or indemnification, because, as evidenced by appellants' own motion to dismiss, appellants could not prove a *prima facie* case against Great Seneca. Furthermore, Great Seneca argued that it had no liability for any negligence of Horton or A & B, because both were independent contractors.

Genstar and Wright also moved for summary judgment. Wright argued that although it had excavated the foundation of the house and graded the yard, Wright "was never involved with the installation or removal of a silt fence" on the lot. Wright also sought summary judgment as to Horton's cross-claims for indemnification and contribution, asserting that Horton had failed to furnish a contract entitling it to indemnification, and that no evidence of negligence could be attributed to Wright's conduct. Similarly, Genstar moved for summary judgment as to Horton's cross-claim, asserting that appellants were unable to show "who caused the stake to puncture the gas line, or when."

On February 12, 1998, appellants filed their opposition to Horton and A & B's motions for summary judgment. With regard to A & B's motion, appellants argued that a jury could

---

judgment or (2) by filing a stipulation of dismissal signed by all parties who have appeared in the action." Because Horton opposed dismissal, the moving parties were forced to ask for leave of court pursuant to Md. Rule 2–506(b), which provides:

> Except as provided in section (a) of this Rule, a plaintiff may dismiss an action only by order of court and upon such terms and conditions as the court deems proper. *If a counterclaim has been pleaded prior to the filing of plaintiff's motion for voluntary dismissal, the action shall not be dismissed over the objection of the party who pleaded the counterclaim unless the counterclaim can remain pending for independent adjudication by the court.*

(Emphasis added).

conclude, based on Atkins's deposition testimony, that the "offending stake" found near the puncture was left there by A & B. Appellants pointed to a portion of Atkins deposition in which he looked at a photograph of the stake found at the scene and opined that it was a silt fence stake, not a grading stake. Appellants also claimed that A & B had an affirmative duty to call "Miss Utility" before repairing the silt fence. Moreover, they contended that whether the explosion was foreseeable was a question for the jury to determine.

With regard to Horton's motion, appellants contended that there was credible evidence that Horton or its subcontractor negligently placed the silt fence over the underground gas line. Appellants also asserted that expert testimony was not needed to establish Horton's negligence. In any event, they claimed that the testimony of Salvatore J. Ficarro, their "standard of care" expert, was sufficient. Moreover, appellants argued that it was for the jury to decide whether the actual cause of the perforation of the gas line was a "superseding intervening cause."

Ficarro, a "Construction/Civil Structural Consultant," was employed by Rothfuss Engineering Company. He testified that, based on forty years of experience in the construction trade, Horton was negligent in installing a silt fence directly over a gas line. The following portion of Ficarro's deposition testimony, which was provided to the court by appellants, is relevant:

HORTON'S COUNSEL: The second opinion that you have here is that—I believe you start—it is negligent to install a silt fence over a natural gas distribution line. And you say that is —— are you saying it's the duty of—

FICARRO: It's his [the general contractor's] responsibility.

HORTON'S COUNSEL: So he cannot—strike that. It's his duty to supervise and see that that does not occur. Is that your point?

FICARRO: Correct.

HORTON'S COUNSEL: And what do you base that duty to supervise on, again, your own personal experience on the jobs you've been involved in personally?

FICARRO: Correct.

HORTON'S COUNSEL: Not on any understanding of what is standard operating procedure amongst the industry at large?

FICARRO: Correct.

HORTON'S COUNSEL: Or within this locality?

FICARRO: Correct.

HORTON'S COUNSEL: And that's the same for both the issue concerning contacting Miss Utility and supervision to assure that silt fences aren't installed over natural gas lines?

FICARRO: Correct.

HORTON'S COUNSEL: The third opinion here is that in removing it, one must take care to remove all the silt fence stakes. Again, you're saying I have to supervise—my client has to supervise that?

FICARRO: It's his responsibility to see that it's removed.

HORTON'S COUNSEL: Okay. And, again, he can't delegate that—

FICARRO: Oh, he can—

HORTON'S COUNSEL:—to a subcontractor?

FICARRO: He can delegate it. I'm not saying he can't delegate it.

HORTON'S COUNSEL: But that doesn't relieve him of—

FICARRO: It doesn't relieve him of the responsibility. If the county inspector comes out and it's still there, the county doesn't care if he told us—you know, some subcontractor to do it.

The circuit court conducted a hearing on February 26, 1998. On March 25, 1998, the court issued a thorough, eighteen-page memorandum opinion and order, which was docketed on March 30, 1998.

Preliminarily, the court granted appellants' motion to dismiss Great Seneca, Wright, and Genstar. It noted, however, that "the granting of [that] motion does not completely dismiss [those] parties from the case because of the cross-claims against them ..." Accordingly, the court considered the defendants' various motions for summary judgment.

With regard to Great Seneca's motion for summary judgment, the court noted that only Horton had opposed that motion. Horton argued that the "offending stake" was not found on the Wankel property. Therefore, a trier of fact could find that Great Seneca, but not Horton, was liable. The court ruled, however, that "the source and location of the stake" were not "material" to the dispute as between Horton and Seneca because, in either case, Great Seneca would not be liable to Horton. The court explained:

> If a fact-finder concluded that the stake came onto the property after Horton bought the property and was within the province of Horton, Great Seneca is exonerated because the stake could not have come onto the property both before and after Horton bought the property. However, if a fact-finder concluded that Great Seneca was responsible for the stake, then neither Horton nor Great Seneca would be liable because Plaintiffs have dismissed their claims against Great Seneca and Horton would not be in a posture to seek contribution from Great Seneca.

The court then turned to Wright's motion for summary judgment, which was opposed only by Horton. The court found "no evidence that Wright had anything to do with the stakes." Consequently, the court rejected Horton's argument that it was entitled to indemnification, because "[i]f a jury finds Horton negligent, it cannot be based on Wright's actions." Further, it ruled that Horton's claim for contribution must also fail, because the right to contribution is based on a joint tortfeasor relationship between the defendants, which no longer applied as to Wright.

In addition, the court granted Genstar's motion for summary judgment. Again, the court rejected Horton's argument

that it was entitled to contribution and indemnification from Genstar, because "[a]ll Plaintiffs and Defendants agree that no witness has testified to any negligent act or omission committed by Redland Genstar."

The court focused its analysis on Horton's motion. The court noted that Horton moved for summary judgment on three grounds: 1) that "Plaintiffs must present expert testimony on standard of care and do not have a qualified expert;" 2) that "there is no factual evidence or evidence from which inferences may be drawn that Horton breached a duty;" 3) and that "if a breach did occur, it was not a proximate cause of the injuries suffered...." Ultimately, the court disagreed with Horton regarding the first two issues. Nevertheless, because it agreed on the third, it entered summary judgment in favor of Horton.

As we indicated, Horton complained that appellants failed to present an expert who could testify as to the applicable standard of care for a contractor. Appellants responded that an expert was not necessary, "either because a contractor is not a professional and his duties should be held to a reasonable person standard, or the negligence is grossly negligent and obvious." Without expressing an opinion about whether an expert witness was needed in order to establish the standard of care of a general contractor, the court ruled that the credentials of Salvatore Ficarro, appellants' named expert, were sufficient to qualify him as an expert "on the standard of care owed by general contractors."

Next, the court determined that, viewed in a light most favorable to the non-moving parties, there were genuine issues of material fact that could lead a jury to conclude that Horton, through its subcontractors, breached a duty owed to appellants. The court was satisfied that appellants presented circumstantial evidence that Horton, through Dodson, "had the offending stake installed over the gas line." Furthermore, the court concluded that Horton and A & B were required to notify "Miss Utility" before making repairs to the silt fence, and opined that a violation of the "Miss Utility" statute "may

provide evidence of negligence." Therefore, the court found that appellants' evidence with regard to A & B's repair of the fence was sufficient to defeat Horton's motion for judgment as to Horton's breach of duty. The court also concluded that summary judgment was inappropriate because there was circumstantial evidence that Horton or its agents failed to remove all of the stakes when it removed the silt fence.

Nevertheless, the court ruled that appellants had failed to show that any of Horton's acts were the proximate cause of the harm. First, the court evaluated the evidence under the "substantial factor test." The court reasoned, in part:

[I]t is undisputed that, regardless of Horton's conduct, Plaintiffs would have not suffered harm from the existence of the offending stake but for a series of extraordinary events. Assuming that Horton was responsible for installing a stake over the gas line, the following subsequent events occurred to cause the explosion: the offending stake became separated from the silt fence fabric; the stake was not removed; the stake was driven into the ground; the stake, at the same time or some later time, hit the round pipe squarely enough and with enough force to crack the pipe; the stake, either at the same time or at some later time, came back out allowing the gas to leak; the unusual frozen cap developed over the ground stopping the escaping gas from harmlessly percolating through the ground; the gas followed the pipe toward the house; the gas entered the house; and finally, something ignited the gas. If any of these events did not occur in this exact sequence, then Plaintiffs would not have been harmed.

While it verges on speculation to say that Horton's conduct created the series of forces that lead [sic] to the cracking of the pipe, the subsequent events cannot be considered continuous and active. The gas line was not damaged upon installation of the fence. The subsequent events occurred from natural forces of weather and unexplained actions by unknown persons. In addition, there was a large gap in time between Horton's conduct and the

explosion which occurred more than thirteen (13) months after Horton sold the house to Wankel.

Because of the "diaphanous nexus" between Horton's negligence and the injury suffered by appellants, the court concluded that Horton's negligence, even if proved, was not a substantial factor in the ultimate catastrophe.

Alternatively, the court found that the explosion was caused by a series of intervening forces that superseded Horton's alleged negligence. Thus, even if Horton's act could be deemed a cause in fact, it concluded that summary judgment was appropriate because the harm was not foreseeable.

Having found that appellants failed to show proximate cause, the court also granted A & B's summary judgment motion. The court noted that because it granted Horton's motion as to liability, Horton's cross-claims against A & B and Dodson were moot. With regard to Dodson, the court said:

> Because the Court is granting Horton's Motion for Summary Judgment, Horton's claims against Dodson are moot. However, Dodson did not file a motion. Upon proper motion, the Court dismiss [sic] Dodson as a Third Party Defendant.

On April 8, 1998, Horton and Dodson stipulated to the dismissal, without prejudice, of Horton's third-party complaint against Dodson. Thereafter, on April 9, 1998, appellants filed a motion for reconsideration, which was subsequently denied. Appellants and Horton then noted their respective appeals and cross-appeal. We shall include other facts in our discussion.

### Discussion

#### I. Standard of Review

■ Maryland Rule 2–501(a) provides that "[a]ny party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." Thus, whether summary judgment is warranted depends on a two-part analysis. "In

order to grant summary judgment, the trial court must determine that no genuine dispute exists as to any material fact, and that one party is entitled to judgment as a matter of law." *Crews v. Hollenbach*, 126 Md.App. 609, 624, 730 A.2d 742 (1999); *Green v. Brooks*, 125 Md.App. 349, 365, 725 A.2d 596 (1999); *Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md.App. 538, 546, 707 A.2d 913 (1998); *see Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996).

In order to defeat a motion for summary judgment, the party opposing the motion must produce some evidence demonstrating that the parties genuinely dispute a material fact. *Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994); *Chicago Title Ins. Co.*, 120 Md.App. at 547, 707 A.2d 913. Even if the non-moving party demonstrates the existence of a disputed fact, it will not defeat the motion for summary judgment unless the dispute concerns a *material* fact. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Keesling v. State*, 288 Md. 579, 583, 420 A.2d 261 (1980); *Miller v. Fairchild Indus., Inc.*, 97 Md.App. 324, 340, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993). Moreover, to demonstrate an adequate factual dispute, the non-moving party must present more than "mere general allegations which do not show facts in detail and with precision. . . ." *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993). But, all reasonable inferences drawn from the facts must be resolved in favor of the non-moving party. *Green*, 125 Md.App. at 365, 725 A.2d 596; *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 387, 693 A.2d 370 (1997); *see also Berkey v. Delia*, 287 Md. 302, 304–05, 413 A.2d 170 (1980).

When there is no dispute of any material fact, we review the trial court's decision to determine whether the court reached the correct legal result. *Beatty*, 330 Md. at 737, 625 A.2d 1005; *Chicago Title Ins. Co.*, 120 Md.App. at 547, 707 A.2d 913. Appellate courts generally review a grant of sum-

mary judgment based only on the grounds relied upon by the trial court. *IA Constr. Corp. v. Carney,* 341 Md. 703, 708 n. 4, 672 A.2d 650 (1996); *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *Gross v. Sussex, Inc.,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 723 A.2d 502, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999); *Hoffman v. United Iron and Metal Co.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

## II. Appeal

In order to recover damages in a negligence action, the plaintiff must establish: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty; (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' " *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995)(quoting *Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180 (1994)). The trial court granted summary judgment because, in its view, appellants could not establish that the negligence, if any, of Horton or A & B was the proximate cause of appellants' injuries. The court's opinion focused on the chain of intervening events that occurred between the defendants' alleged negligent acts and the explosion, concluding that appellants were unable to establish either cause in fact or legal causation.

Appellants contend that the trial court erred in removing the question of proximate cause from the jury. They assert: "While it is true that a number of events had to take place following Horton and A & B's negligent conduct in order for the explosion to occur, none of them were unforeseeable as a matter of law."

We turn to consider the issue of proximate cause. In doing so, we are mindful that questions of proximate causation are often intractable, in part because proximate cause is a "concept that possesses a chameleon-like ability to defy precise categorization, and must be analyzed on a case-by-case basis." *Yonce v. SmithKline Beecham Clinical Laboratories,*

*Inc.,* 111 Md.App. 124, 136–37, 680 A.2d 569, *cert. denied,* 344 Md. 118, 685 A.2d 452 (1996). Citing Prosser and Keeton, we noted in *Yonce:*

There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement as to the best approach. Much of this confusion is due to the fact that no one problem is involved, but a number of different problems, which are not distinguished clearly, and that language appropriate to a discussion of one is carried over to cast a shadow upon the others.

*Id.* at 137, 680 A.2d 569 (quoting PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 26 (5th ed.1984)).

▆▆▆▆ "Proximate cause consists of two elements: (1) cause in fact and (2) legally cognizable cause." *May v. Giant Food, Inc.,* 122 Md.App. 364, 383, 712 A.2d 166, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998). *See also Johnson & Higgins of Pennsylvania, Inc. v. Hale Shipping Corp.,* 121 Md.App. 426, 450, 710 A.2d 318, *cert. denied,* 351 Md. 162, 717 A.2d 385 (1998); *Yonce,* 111 Md.App. at 137, 680 A.2d 569. Causation in fact raises the threshold question of "whether the defendant's conduct *actually* produced an injury." *Peterson v. Underwood,* 258 Md. 9, 16–17, 264 A.2d 851 (1970); *see also Bell v. Heitkamp,* 126 Md.App. 211, 222, 728 A.2d 743 (1999)(observing that "[a] defendant's breach of duty, standing alone, does not mean that a defendant is negligent. The breach of duty must proximately cause injury to the plaintiff"). Maryland courts have employed two tests to determine whether cause in fact exists: the "but for" test and the "substantial factor test." *Yonce,* 111 Md.App. at 138, 680 A.2d 569. In *Yonce,* the Court explained the difference between the two concepts:

By its very nature, the "but for" test applies when the injury would not have occurred in the absence of the defendant's negligent act. The "but for" test does not resolve situations in which two independent causes concur to

bring about an injury, and either cause, standing alone, would have wrought the identical harm. The "substantial factor" test was created to meet this need but has been used frequently in other situations.

*Id.* (citations omitted).

Legal cause, on the other hand, asks whether the defendant, in light of "considerations of fairness and social policy," should be held liable for the injury, even when cause in fact has been established. *Peterson,* 258 Md. at 16, 264 A.2d 851. "Thus, although an injury might not have occurred 'but for' an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury, or if the injury is so remote in time and space from defendant's original negligence that another's negligence intervenes." *Id.*

The question of legal causation often involves a determination of whether the injury was foreseeable. As we stated in *May:* "A person will not be relieved of liability for a negligent act if, at the time of that act, the person 'should have foreseen the "general field of danger," not necessarily the specific kind of harm to which the injured party would be subjected as a result of the [person's] negligence.'" *May,* 122 Md.App. at 384, 712 A.2d 166 (citations omitted).

Maryland courts have adopted the view found in § 435 of the *Restatement (Second) of Torts* (1965)("The Restatement") concerning proximate causation. *Board of County Commrs. of Garrett County v. Bell Atlantic–Maryland, Inc.,* 346 Md. 160, 184, 695 A.2d 171 (1997); *Atlantic Mutual Ins. Co. v. Kenney,* 323 Md. 116, 129–30, 591 A.2d 507 (1991); *Henley v. Prince George's County,* 305 Md. 320, 334, 503 A.2d 1333 (1986). That section states, in pertinent part:

**Foreseeability of Harm or Manner of Its Occurrence**
(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

Here, the trial court applied the "substantial factor" test. Quoting *Yonce*, it considered three factors in determining whether Horton's [10] conduct was a substantial factor in bringing about appellants' injuries. The factors, as articulated in *Yonce*, are:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

*Yonce*, 111 Md.App. at 138–39, 680 A.2d 569 (in turn quoting Restatement § 433); *see also Bartholomee v. Casey*, 103 Md. App. 34, 56–57, 651 A.2d 908 (1994), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995)(collecting cases on the "substantial factor" test). In the trial court's view, the installation of a silt fence stake over a gas line could not have caused the explosion unless a series of "extraordinary" events occurred. The stake would have had to become separated from the fence meshing, and then left in the ground. At some later time, it was driven deeper into the ground by some unknown force, in such a way as to puncture, with the sharpened end of the stake, a round plastic pipe. Thereafter, another unknown force would have had to dislodge the stake, allowing gas to leak into the ground. Furthermore, the explosion would not have occurred unless an ice cap had developed in such a way as to prevent the gas from seeping up "harmlessly" through the soil. Finally, some-

---

**10.** As we mentioned earlier, the trial court analyzed Horton's conduct first, and then applied its conclusions to A & B.

thing within the house must have ignited the gas, sparking the explosion.

The trial court compared the causal nexus in appellants' case to that in *Peterson v. Underwood*, 258 Md. 9, 264 A.2d 851 (1970). There, a young boy was killed when a five-year old concrete wall collapsed on him. The plaintiff presented evidence that the wall had been built in a defective manner, in violation of local building codes; the wall "had no steel reinforcing rods, no butresses or pilasters, and no subsurface footing." *Id.* at 14, 264 A.2d 851. The evidence also indicated that the wall had been built on a slight angle. Between the time of the wall's construction and the accident, a subsequent tenant or owner installed a metal rod in the shape of an inverted "U" into the wall, to support a clothesline. *Id.* at 13, 264 A.2d 851. The Court of Appeals concluded that "the Plaintiff's proof was clearly sufficient to allow the jury to find that [the defendant] negligently constructed . . . the wall and that [the boy's] death was the result of the collapse of that wall." *Id.* at 15, 264 A.2d 851. Nonetheless, the Court ruled in favor of the defendant, stating:

> What we find to be a fatal defect in . . . Underwood's case is lack of any evidence causally linking defendant's negligence to the injury suffered. Such a defect is described as a failure to prove that defendant's negligence was the proximate cause of the accident.

* * *

The validity of an inference depends on commonly experienced relationships of acts and forces; thus spatial and temporal distances between one occurrence and another may militate against connecting them by an inference of cause and effect. Plaintiff in our case has proved too little and too much at the same time. On one hand, her expert witness did not give his opinion on what caused the wall to fall, his testimony amounting to no more than that the original construction of the wall was negligent. On the other hand, by negativing likely contributing causes shortly before the wall fell, such as the children pulling on the clothesline, plaintiff left the jury with no data with which

they could evaluate how 'substantial a factor' the original negligent construction was in causing the later injury.

*Peterson,* 258 Md. at 15, 18, 264 A.2d 851.

The Court in *Peterson* also focused on the amount of time that had elapsed between the negligent act and the harm, stating:

> With the limited proof in this case we hold that the glimmering of a causal connection has been extinguished by the passage of time, and direct proof is necessary to re-illumine the relationship. Without other types of direct proof, the testimony of experts most frequently corrects this deficiency. To allow a jury to draw the connection now without direct proof would allow them to indulge in mere conjecture or speculation. It would amount to holding that liability may be predicated upon the mere happening of an accident which, exclusive of *res ipsa loquitor* situations, is not the law of Maryland.

*Peterson,* 258 Md. at 19, 264 A.2d 851.

Appellants contend that *Peterson* is inapposite because, in the case *sub judice,* "there is direct evidence that Horton and/or A & B were responsible for the installation of a silt fence directly over a marked gas line, that repairs were made to the silt fence by A & B in the location where the 'offending stake' was ultimately unearthed, that A & B had previously performed repairs where they had left a stake in the ground because it was buried too deeply, that Horton was responsible for the removal of the silt fence, and that the explosion was caused by a puncture in the gas line in the exact location where the silt fence was installed and the 'offending stake' was found."

In analyzing the matter presented here, *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 624 A.2d 496 (1993), provides guidance to us. In *Stone,* a homeowner sued his title insurer and the attorney who represented him in the purchase of a new home, alleging negligence and breach of contract for their failure to record a release of a deed of trust in a timely manner. *Id.* at 332, 624 A.2d 496. Stone contended that because the loan release was not recorded, he was prevented

from obtaining a $50,000.00 home equity loan more than a year after he purchased the home. Moreover, Stone had applied for the home equity loan in order to purchase " 'stock puts' to protect his financial position in the stock market in response to anticipated margin calls on certain stocks he had purchased on credit." *Id.* at 332, 624 A.2d 496. Because Stone was unable to borrow money, he claimed that he was forced to meet the margin call and sold his stock at a substantial loss.

Citing § 435(2) of the Restatement, the Court held that the attorney's negligence was not a proximate cause of Stone's loss, because Stone's loss was not within the "general field of danger that [the attorney] should have anticipated." *Id.* at 337, 624 A.2d 496. The Court explained:

> In the instant case, Stone would have us hold that his loss arising from the August, 1990 collapse in the market in certain stocks in which he was speculating was proximately caused by his sale of those stocks, which was caused by his lack of funds to pay off other loans, which was caused by his inability to secure a second mortgage before August 6, 1990, which in turn was caused by Savitz's failure to record timely the release of the extinguished lien on his home. He argues that but for Savitz's negligence he would have secured a home equity loan and used the proceeds to meet his broker's margin call, thus avoiding the sale of stock to raise capital in a falling market. We disagree. *We believe that Stone's stock market damages were a highly extraordinary result of Savitz's failure to timely record the release. We hold that there was no acceptable nexus between Savitz's negligent conduct and the stock market losses suffered by Stone and, consequently, that Savitz's negligence was not the proximate cause of the ensuing harm which befell Stone.*

*Id.* at 340–41, 624 A.2d 496 (emphasis added).

Appellants analogize the case to *Texas Co. v. Pecora*, 208 Md. 281, 118 A.2d 377 (1955). There, two boys were burned when a gasoline tank owned by the Texas Company ("the Company") exploded. The tanks had been placed on a vacant lot by agents of the Company, after the owners of a nearby

gas station and grocery store, who leased the tanks from the company, decided to enlarge the store. Approximately twenty feet from the tanks stood a metal trash can, which was used by clerks of the gas station to burn trash. The boys were playing near the unsecured tanks when one of them took a lighted stick from a fire in the trash can and held it to a puddle of gasoline that had seeped from the tank, causing an explosion. From the evidence adduced at trial, it was uncertain whether a gasoline station employee had failed to extinguish the fire in the trash can, or whether it was reignited by one of the children who had been playing in the area. The jury returned a verdict for the boys and their parents. On appeal, the Court held that the Company's negligence in leaving the tanks unsecured on a vacant lot proximately caused the boys' injuries. The Court said:

> Proximate cause being a question for the jury, it was warranted in this case in finding that although the Texas Company capped the pipes leading to the tanks, it knew the tanks must be moved; it knew a suction pipe about five feet long was attached to the tank and ran into a concrete island; that a vent pipe attached to the tank extended fifteen feet up the side of a building and a fill pipe two feet long was attached to the tank. The jury could have found that the Texas Company knew or should have known that these pipes would be cut off or disconnected in removal of the tank from the ground. The jury could have found that the tank once removed, with open pipes attached, was known by the Texas Company to be a dangerous instrumentality, capable of doing great harm; and that the removal to a vacant lot, the rolling about by the children, the application of the fire and the explosion and injury were all links in a chain of foreseeable circumstances. The facts of the case are such that the Court cannot say as a matter of law that the original negligence of the Texas Company was not the proximate cause of the injury.

*Id.* at 294, 118 A.2d 377.

In our view, the case at bar is more akin to *Peterson* than *Pecora.* We recognize that, in the light most favorable to

appellants, the evidence was sufficient to show that the explosion was caused by a leak in the underground gas pipe, and that the leak was caused by a puncture from a silt fencing or grading stake. There was no evidence, however, that the gas line was pierced at the time of installation or repair of the silt fence. Nor have appellants offered any legally significant evidence that would allow the jury to determine how the stake made its way into the gas main, or who among a field of defendants was responsible for that occurrence. At best, appellants could prove only that a stake was left in the ground and that the silt fence stakes and grading stakes should not have been installed over a gas line. Whether Horton or A & B's negligence was a substantial factor in causing the ultimate explosion depends, however, on what "caused" the wooden stake to pierce the pipe. Moreover, even assuming that the silt fence was negligently installed over the gas line, or that the grading was negligent, or that A & B or Dodson negligently left the stake in the ground, we cannot say that the gas explosion was a foreseeable consequence of such conduct.

Significantly, appellants' own expert, having studied the accident thoroughly for Washington Gas, could not offer an opinion as to how the stake made its way into the gas pipe. Appellants have only meager proof that Horton or A & B was responsible for driving the stake down to a depth of thirty-nine inches, much less that appellees did anything that would have caused the stake to strike the gas line with such force that it penetrated the gas pipe. Because a jury would have been unable to ascribe fault to any of the appellees for what transpired, the trial court was correct in not permitting a jury to speculate about such a crucial evidentiary gap.

We are mindful that, "[o]rdinarily, the question of whether causation is proximate or superseding is a matter to be resolved by the jury." *May*, 122 Md.App. at 383, 712 A.2d 166; *see Lane, supra,* 338 Md. at 52, 656 A.2d 307. Nonetheless, based on the evidence before the trial court, appellants were unable to show that Horton's or A & B's negligence was a cause in fact of the explosion, nor were they able to

demonstrate that appellants' injuries were a foreseeable consequence of the alleged negligent acts.

To be sure, as *Pecora* illustrates, each link in the causal chain need not have been under the control of the one whose negligence triggered the chain of events. Nor do we suggest that the lapse of time between the negligent act and the injury is dispositive. A foreseeable injury may follow months, if not years, after a negligent act that triggers a calamitous chain of events. Nevertheless, each link in the causal chain must be connected to the one that came before.

Alternatively, the trial court found that, even if appellees' negligence in leaving the stake in the ground was a "cause in fact" of the explosion, the intervening forces that combined to drive the stake into the pipe and trigger the ultimate explosion were superseding causes that obviated appellees' liability. Again, *Yonce* provides guidance.

In *Yonce*, we held that the six factors set out in Restatement § 422 "should be evaluated when determining whether an intervening force rises to the level of a superseding cause." *Yonce*, 111 Md.App. at 146, 680 A.2d 569. Specifically, the trial court should examine:

(a) the fact that its [the intervening force's] intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.*

The trial court's opinion evaluated each factor separately. With regard to factor (a), the court noted that "[t]he normal result of 'negligently' placing a silt fence stake over a gas line is that the stake is removed with the rest of the silt fence when sediment control is no longer needed. If the stake gets separated from the silt fence as the offending stake apparently did, the customary result is still harmless." As to factor (b), the court stated that "[e]ach subsequent event, all of which were necessary to achieve the final result, is in some degree unexpected if not extraordinary. The cumulative effect is an extraordinary event." With regard to factor (c), the court observed that "[t]he force which drove the stake down then up, the weather, and the source of ignition are independent intervening forces unconnected to Horton's conduct." In considering factors (d), (e), and (f), the court stressed that the cause of the gas line puncture remains unknown. The court stated that although "[t]he person or object driving down the offending stake is unknown by identity or time," the court opined that "[t]he driving down of the stake into the ground is a potentially wrongful act."

Appellants contend that "as long as the intervening act is one that the original actor should have anticipated, was an act which a reasonable person would not consider highly extraordinary in light of the situation involved, or was a normal consequence of the situation created by the original actor," the intervening acts cannot be considered superseding causes. In appellants' view, "a question of fact was raised about whether the act of a third party driving the 'offending stake' into the ground was a superceding cause."

Appellants are correct in emphasizing foreseeability as a crucial aspect of a superseding cause analysis. Recently, in *Matthews v. Amberwood Assoc. Ltd. Partnership, Inc.*, 351 Md. 544, 578, 719 A.2d 119 (1998), the Court of Appeals reiterated what had been made clear in *Lane:* namely, that

" '[e]ssentially, the intervening negligence is not a superseding cause if it is reasonably foreseeable.' " (quoting *Lane, supra,* 338 Md. at 52, 656 A.2d 307). The *Matthews* Court quoted the helpful explanation of superseding cause found in *State v. Hecht Company,* 165 Md. 415, 422, 169 A. 311 (1933):

> If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another.

*Matthews,* 351 Md. at 578, 719 A.2d 119; *see also Kenney, supra,* 323 Md. at 131, 591 A.2d 507.

We agree with the trial court that the intervening causes that allegedly combined to link one segment of the causal chain to another, so that an abandoned wooden stake contributed to the explosion of appellant Wankel's home, were highly extraordinary and, in the aggregate, unforeseeable. We explain.

The case of *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 642 A.2d 219 (1994), is helpful. There, a patient escaped from a State-operated hospital for the mentally ill, where he was assigned to a "high security ward for acutely disturbed patients." Three days after his escape, the patient appeared in Bethesda, Maryland. There, officers of the Montgomery County Police Department, believing that the patient was "homeless and in need of emergency shelter," referred him to the Montgomery County Department of Social Services, which arranged for the escapee to stay at the Manor Inn of Bethesda for the night. The following morning, the

patient stole a laundry van that had been left unattended with the keys in the ignition. *Id.* at 139, 642 A.2d 219. Thirty minutes after commandeering the van, the patient negligently drove it into a car that was stopped at a stop sign, injuring the driver. *Id.* at 140–41, 642 A.2d 219. In the wake of the accident, the driver's insurance company sued the State and the Manor Inn in an attempt to recover what it had paid its insured under its insurance policy, alleging negligence. *Id.* The plaintiff claimed the State was negligent in failing to detain the patient. The plaintiff also claimed Manor Inn was negligent in leaving the van unattended with the keys in the ignition. The court granted summary judgment in favor of the State because it found that State had no duty to protect the driver whose car was struck by the stolen van; the collision was not a foreseeable consequence of the patient's escape from the State facility. The court also, *sua sponte,* granted summary judgment in favor of Manor Inn, on the ground that the patient's negligent driving was a superseding cause of the insured's injuries.

On appeal, the Court held that the trial court erred in granting summary judgment to Manor Inn without a motion requesting it. *Id.* at 144–47, 642 A.2d 219. The Court went on to address the issue of Manor Inn's liability, however, and concluded that summary judgment was appropriate because the patient's negligence was a superseding cause. The Court reasoned:

> Leaving the keys in the ignition of a motor vehicle increases significantly the chances of that vehicle being stolen. Thus, viewing the total facts of the case *sub judice,* it is patent that it was reasonably foreseeable that, by leaving the keys in the ignition, a thief would take the van. In the case *sub judice,* but for the negligence of Manor Inn, [the patient] would not have taken the van. It is not so clear, however, that the thief would drive negligently, and even more un- clear that, in doing so, he or she would injure the plaintiff. Consequently, while the negligence of Manor Inn clearly was the proximate cause of the theft of the van, it does not follow that that causal relationship continued from the mo-

ment of the theft to the moment of the impact between the van and [the insured's] car. [The patient's] conduct in taking the van was not "highly extraordinary"; indeed, it was highly predictable. On the other hand, *the manner in which he drove the van, and its consequences, were "highly extraordinary."*

*Id.* at 160, 642 A.2d 219 (emphasis added).

Moreover, the case *sub judice* is distinguishable from *Atlantic Mutual Insurance Company v. Kenney, supra,* 323 Md. 116, 591 A.2d 507. There, the driver of a tractor-trailer parked his 45–foot truck and trailer in a no-parking zone, so that it blocked the view of drivers attempting to exit a shopping center parking lot, as well as the view of drivers proceeding on the road that passed the exit. While the trucked was parked there, Tracey Hill, driving her father's car, attempted to exit the parking lot, despite the obstructed view. As she pulled into the intersection, she struck an approaching car. Subsequently, Tracey's father and his insurer instituted suit against Kenney, the driver of the truck, and Kenney's employer, Roadway Express, Inc. *Id.* at 119, 591 A.2d 507. At trial and on appeal, the defendants claimed that Tracey's negligence in pulling into the intersection was not foreseeable, and constituted a superseding cause of the ultimate damage. The Court of Appeals disagreed, holding that

the risk of the very type of harm that was suffered here was reasonably foreseeable from the negligence of Kenney in parking his tractor trailer so as to significantly obstruct the vision of drivers likely to meet at that point. The negligence of Kenney continued through the moment of impact. The conduct of Hill was not "highly extraordinary"—it was predictable. The circuit court erred in finding absence of proximate cause as a matter of law.

*Id.* at 132, 591 A.2d 507.

In our view, *Kenney* illustrates what is missing in the case *sub judice.* Unlike *Kenney,* appellees' alleged negligence was remote in time. Moreover, unlike *Kenney,* one would have been hard pressed to predict, at the time of the alleged

negligence, what catastrophe might occur as a result of using or discarding the wooden stake.

In sum, we conclude that, in the light most favorable to appellants, a jury could conclude that a wooden stake punctured the gas line, and that the stake was probably a silt fencing stake. We do not know, however, how the puncture occurred, or who had contact with the stake when it was imbedded in the ground. Because it appears rather extraordinary to us that leaving a wooden stake at the site or in the ground, even above a gas line, would set off the chain of events that culminated in this disaster, we perceive no error by the trial court in ruling in favor of Horton & A & B. To the contrary, appellants failed to show that the negligence of Horton and A & B proximately caused appellants' harm.

### III. Cross–Appeal

Maryland Rule 2–332(a) provides that "[a] defendant, as a third-party plaintiff, may cause a summons and complaint ... to be served upon a person not previously a party to the action *who is or may be liable* to the defendant for all or part of a plaintiff's claim against the defendant." (Emphasis added). Thus, a third-party complaint is "by its nature ... a contingent claim." *Hartford Accident and Indemnity Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 283, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *see* Paul V. Niemeyer & Linda M. Schuett, MARYLAND RULES COMMENTARY 224 (2nd ed.1992). A third-party complaint "alleges that, *if* the defendant is found liable to the plaintiff, then the third-party defendant is, in whole or in part, liable to the defendant." *Scarlett Harbor Assocs.,* 109 Md.App. at 283, 674 A.2d 106.

In this case, Horton's indemnity and contribution claims against Great Seneca, Genstar, A & B, Wright, and Triangle were predicated on the possibility that Horton would be found liable for appellants' damages. Because we have concluded that the court properly entered summary judgment in favor of Horton, the cross-claims filed by Horton are

academic. Therefore, we shall not address the issues raised by Horton's cross-appeal, nor by the cross-appellees' various motions to dismiss Horton's cross-appeal. *See Kennedy v. Mobay Corp.,* 84 Md.App. 397, 431, 579 A.2d 1191, *aff'd,* 325 Md. 385, 601 A.2d 123 (1992)(declining to reach "defensive cross-appeals" when this Court affirmed judgments entered in favor of defendants in a tort action); *see also Board of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 200, 725 A.2d 1027 (1999)(noting that "[a] question is moot 'if, at the time it is before the court, there is no longer an existing controversy between the parties, *so that there is no longer any effective remedy which the court can provide.*' ")(emphasis added)(quoting *Attorney Gen. v. Anne Arundel County School Bus Contractors Ass'n.* 286 Md. 324, 327, 407 A.2d 749 (1979)).

**JUDGMENT AFFIRMED; CROSS–APPEAL DISMISSED; HORTON'S MOTION TO SUPPLEMENT BRIEF DENIED; COSTS TO BE DIVIDED EQUALLY AMONG APPELLANTS.**