887 A.2d 97

**Bruce SINDLER, Individually, etc.**

v.

**Honey LITMAN, et al.**

**No. 1838 Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Dec. 2, 2005.

96

98

Kathleen M. Meredith (Stephen Y. Brennan, Iliff & Meredith, on the brief), Pasadena, Md, for Appellant.

Kristine A. Crosswhite (Susan E. Smith, Crosswhite, Limbrick & Sinclair, L.L.P., on the brief), Baltimore, MD, for Appellee.

Panel: DAVIS, JAMES R. EYLER, and BARBERA, JJ.

JAMES R. EYLER, Judge.

This case arises out of a motor vehicle accident that occurred on December 7, 1994. In 1997, Barbara Sindler (Ms. Sindler), the occupant of one vehicle, and Bruce Sindler, M.D. (Dr. Sindler or appellant), her spouse, filed a negligence claim in the Circuit Court for Baltimore County, seeking compensation for personal injuries and loss of consortium. The defendants were Honey Litman (Ms. Litman or appellee), the operator of the other vehicle, and Jeffrey Litman (Mr. Litman or appellee), her spouse and the alleged principal of Ms. Litman. The court entered summary judgment in favor of the Sindlers on the issue of liability. The pre-trial process was very lengthy, and the case was not tried until September, 2004.

Prior to trial, on July 5, 2004, Ms. Sindler committed suicide, and on July 16, Dr. Sindler filed an amended complaint to include wrongful death and survival claims. Also prior to trial, the circuit court entered summary judgment in favor of the Litmans with respect to the wrongful death claim, on substantive law grounds.

After a jury returned a verdict for Dr. Sindler with respect to survival and loss of consortium claims, the circuit court granted the Litmans' motion to dismiss the entire case based on discovery violations.

On appeal, Dr. Sindler challenges the dismissal of the wrongful death claim on substantive law grounds and the dismissal of the entire case based on discovery abuse. We shall affirm the court's rulings.

## Factual Background

In November, 1997, Ms. Sindler and Dr. Sindler filed a complaint in circuit court against Ms. Litman and Mr. Litman, appellees.[1] The suit contained a claim by Ms. Sindler for her

---

1. American Alliance Insurance Company was named as an additional defendant. The claim against that defendant is not relevant to the issues on appeal.

personal injuries and a joint claim by the Sindlers for loss of consortium.

The Sindlers alleged that Ms. Sindler was stopped at a traffic signal when Ms. Litman collided with the rear of her vehicle. The Sindlers moved for summary judgment on the issue of liability, and on July 14, 2002, the court granted it.

There were several changes in counsel during the pre-trial phase of the case. Appellant's present counsel has been involved only on appeal, and appellees' present counsel has been involved since October, 2000. Several scheduling orders were entered, and several trial dates were set. There were several postponements, and the case was delayed because of continuing medical treatment by Ms. Sindler, because of substitution of counsel for the Sindlers, and because of business and personal conflicts of counsel and the parties.

In January, 1998, appellees propounded interrogatories and a request for documents to the Sindlers. On September 14, 1998, appellees filed a motion to compel and for sanctions, asserting that the Sindlers had not responded to the discovery requests, despite repeated oral and written demands. By order dated October 7, 1998, the court granted the motion and ordered the Sindlers to respond within 10 days of the order.

The Sindlers did not comply with the order. In September 1999, the Sindlers provided unexecuted answers to interrogatories and a response to the request for production. The Sindlers later supplemented the responses, but according to the court's rulings, the supplementation was incomplete and untimely. The Sindlers never served executed answers to interrogatories, as required by Rule 2-421.

In 2000, appellees filed motions to compel medical examinations of Ms. Sindler and motions to exclude expert witnesses who had not been identified in a timely manner. The schedule was changed on several occasions. In April and July, 2000, appellees took the deposition of Ms. Sindler.

On April 17, 2000, the Sindlers filed a motion for summary judgment on the issue of liability as to Ms. Litman, and on

July 12, 2000, the court granted it. The docket reflects little activity in 2001 and 2002, except for the issuance of scheduling orders, later modified.

On January 3, 2003, the Sindlers filed an expert witness list. In August 2003, appellees filed a motion to compel medical examinations of Ms. Sindler, which was granted by order dated October 8, 2003. In the same order, the court required the Sindlers to identify all expert witnesses by December 31.

In December 2003, the Sindlers served supplemental expert witness lists. On January 7, 2004, appellees filed a motion for protective order with respect to the designations. In the motion, appellees observed that the Sindlers had identified a total of 32 experts, which called into question the ability to keep the then scheduled trial date of March 22, 2004. Appellees requested that the court limit the number of experts and require them to submit to depositions. On January 16, 2004, the Sindlers filed a modified expert list, naming 12 experts, including an expert not previously identified. On January 20, appellees filed a motion to strike the new expert.

On January 22, 2004, the court held a hearing on the motions, and by order dated January 23, postponed the March 22 trial date, rescheduled it for September 8, 2004, and ruled on the motions. The court limited the Sindlers to two medical experts per specialty or claim plus an economist or life planning expert, to be identified by February 23, 2004, and ordered disclosure of all medical records expected to be introduced into evidence. The court also ordered appellees to file an amended expert witness list by March 23, 2004, and ordered that discovery would close on September 8.

Because of Ms. Sindler's continuing treatment and the increase in the nature and extent of her alleged injuries, appellees requested to take a second deposition of the Sindlers. With respect to the nature and extent of injuries, the record indicates that Ms. Sindler was transported to Sinai Hospital after the accident. At that time, she complained of back pain, headaches, and soreness. There was no indication of direct trauma to her head or chest. She was treated and

released. According to the initial unexecuted draft of answers to interrogatories forwarded by her counsel, Ms. Sindler, at that time, complained of neck and back strain, temporo mandibular joint pain, headaches, depression, and shifting of a breast implant that necessitated surgery. Over time, additional injuries and symptoms were described in papers filed by her counsel or in medical records. In the expert witness list filed in January 2004, the injuries included traumatic brain injury, thalamus damage, migraine headaches, the need for treatment for chronic pain, including laser treatment, the need for a wrist operation and other orthopedic surgery, gastric problems, the need for eye and ear care, a sleep disorder, and the need for physical therapy.

According to an affidavit by a legal assistant in the office of appellees' counsel, which was not contradicted by sworn testimony, the following occurred. The first request to re-depose the Sindlers was in February 2003. The Sindlers' counsel agreed, but it was not accomplished. In November 2003, new counsel entered an appearance for the Sindlers, who remained throughout the trial, but was not active during the trial itself.[2] New counsel for the Sindlers agreed to the re-depositions and, for several months in 2004, appellees' counsel attempted to obtain agreed dates. In June 2004, appellees' counsel filed formal notices of deposition for July 6 and 7. In a subsequent telephone conversation between an assistant in the office of the Sindlers' counsel and an assistant in the office of appellees' counsel, they agreed that the deposition of Ms. Sindler would occur on July 7 and that counsel for the Sindlers would get a new date for Dr. Sindler's deposition. On July 1, counsel for the Sindlers objected to the depositions, for the first time, on the ground that the Sindlers had been deposed in 2000. On July 6, the Sindlers' counsel advised appellees that, on July 5, Ms. Sindler had committed suicide.

On June 4, 2004, appellees filed a request for admission of facts and genuineness of documents directed to the Sindlers.

---

2. Shortly before trial, other counsel was admitted *pro hac vice* to conduct the trial.

The responses were due on or about July 6.[3] The Sindlers did not, at any time, file a response, a motion for additional time, a motion to withdraw deemed admissions, or a motion seeking other relief.

On July 16, 2004, Dr. Sindler, as personal representative of the estate of Ms. Sindler and as surviving spouse, filed an amended complaint, containing wrongful death and survival claims. Dr. Sindler alleged that the accident in question caused Ms. Sindler's death.

Also on July 16, appellees filed a motion to dismiss the entire case based on discovery violations. Appellees asserted a history of discovery abuses but primarily relied on the refusal of the Sindlers to be re-deposed and their failure to supply complete medical records and bills by February 23, as required by the court's January 23, 2004 order. On July 23, appellant filed an opposition to the motion, asserting that the Sindlers had substantially complied with discovery and that they had forwarded medical records as they had become available and would continue to do so.

On July 26, 2004, appellees filed a motion to dismiss the wrongful death claim on the ground that suicide is not a legally cognizable basis for a wrongful death claim because it is barred as a matter of law and/or that the evidence in this case did not support the claim. On August 3, 2004, appellant filed an opposition.

On August 4, 2004, the court held a hearing on outstanding motions, and on August 5, issued a ruling. The court granted the motion to dismiss the wrongful death claim,[4] reserved on

---

**3.** Appellant's amended complaint alleges that he was appointed personal representative of Ms. Sindler's estate sometime prior to the date of its filing, which was July 16. Consequently, the time for response was extended until late July. See Md Rule 1–203(d) (time requirements extended to 60 days from date of death or 15 days from issuance of letters of administration, whichever is earlier).

**4.** The court considered matters outside of the pleadings, thereby converting the motion to a motion for summary judgment. *See* Md. Rule 2–322(c).

the motion to dismiss based on discovery violations, denied appellant's motion to supplement his expert witness list, and granted appellees' motion to re-depose Dr. Sindler.

At the hearing, the court considered the deposition of Dr. Gary Lefer and the deposition of Ms. Sindler, taken in 2000, offered by appellant. The court asked appellant's counsel if appellant had any additional evidence to present, and counsel replied in the negative. The court also considered a one page document, offered by appellees. The document, containing Dr. Sindler's letterhead, invited recipients to attend a seminar on wellness. The document stated that the Sindlers earned over $500,000 in residual income over the past 2 years, while working in their wellness business part time. Additionally, it stated that the additional income had allowed them "to travel extensively around the world." Appellant asserts that the court also considered a written report by Dr. Lefer, but appellees dispute that.

On August 16, 2004, appellant filed a motion for reconsideration of the court's ruling on the motion to dismiss the wrongful death count. Appellant attached an affidavit from Dr. Lefer and medical reports from other health care providers. On August 26, appellees filed an opposition, and on the same date, the court denied the motion, without giving reasons.

On September 8, 2004, the first day of trial, appellees filed several written motions and made several oral motions. One of the oral motions was a motion *in limine*, requesting the court to rule that the request for admissions and attached medical reports were admissible into evidence. The court so ruled, and during trial, appellees did admit them into evidence. The request for admissions related to complaints made by Ms. Sindler and medical treatment received by her prior to the accident in question. The request referenced medical records attached to it.

At trial, appellant testified and called several friends, acquaintances, and relatives, who described Ms. Sindler's ability to function before and after the accident, specifically, her

deteriorating mental and physical health after the accident. Appellant also called treating physicians as expert witnesses, who testified that Ms. Sindler sustained a closed head injury in the accident, opined that her chronic pain and other symptoms were caused by the accident, and opined that her poor mental health was caused by the accident.

At the close of appellant's case, appellees made a motion for judgment and renewed their motion to dismiss. The court denied the motion for judgment and continued to reserve on the motion to dismiss.

Ms. Litman and medical experts testified on behalf of appellees. Not surprisingly, the experts disagreed with appellant's experts.

At the close of all the evidence, appellees renewed their motion for judgment and motion to dismiss. The court reserved on both motions.

On September 21, 2004, the jury returned a verdict in favor of appellant as personal representative of the estate for non-economic damages in the amount of $28,000 and for loss of consortium in the amount of $10,000.

On October 4, 2004, the court held a hearing on the reserved motions and granted both of them. This appeal followed.

### Questions Presented

As rephrased by us, appellant presents the following questions.

1. Did the circuit court err in granting appellees' motion for summary judgment with respect to the wrongful death claim?

2. Did the circuit court err in granting appellees' motion to dismiss?

3. Did the court err in granting appellees' motion for judgment notwithstanding the verdict?

## Discussion

### *Wrongful death claim*

Relying on *Eisel v. Bd. of Ed. of Montgomery County*, 324 Md. 376, 389–90, 597 A.2d 447 (1991), and several cases from other jurisdictions,[5] appellant contends the court erred in granting summary judgment in favor of appellees on the wrongful death claim.

### *Standard of Review and Court's Ruling*

Before we delve into the substantive issues presented, we note that our task is to determine whether the circuit court's grant of appellees' motion for summary judgment was legally correct. *Yonce v. SmithKline Beecham Clinical Laboratories, Inc., et al.*, 111 Md.App. 124, 135, 680 A.2d 569 (1996) (citing *Dixon v. Able Equip. Co., Inc.*, 107 Md.App. 541, 543–44, 668 A.2d 1009 (1995)). The circuit court, in turn, was empowered to

> enter judgment in favor or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law . . .

Md. Rule 2–501(e)(1996).

In its ruling dated August 5, 2004, the court stated that

> [t]he following facts are undisputed by the parties and are relevant to disposition of the motions argued on August 4, 2004. Mrs. Sindler was taken to the hospital immediately after the accident ·and was treated for minor physical injuries and released the same day. However, Mrs. Sindler continued to complain of mental injuries that she associated with the accident. In the months and years following the accident Mrs. Sindler sought medical treatment for her alleged mental injuries from some 75 doctors throughout the

---

5. *E.g., Fuller v. Preis*, 35 N.Y.2d 425, 363 N.Y.S.2d 568, 322 N.E.2d 263 (1974); *Orcutt v. Spokane County*, 58 Wash.2d 846, 364 P.2d 1102 (1961)(en banc); *Exxon Corp. v. Brecheen*, 526 S.W.2d 519 (Tex.1975).

country. Mrs. Sindler has never been hospitalized for any extended period of time as a result of this accident. Mrs. Sindler has never been declared insane. From the date of the accident that occurred ten years ago Mrs. Sindler has been able to drive a car, raise children, function in the community, perform the functions of every day life, and travel extensively throughout the world.

In granting the summary judgment motion, the court stated that the action could not be maintained under "common law, the Restatement of Torts, or foreseeability and proximate cause," the three possible theories. In referring to the deposition testimony of Dr. Lefer, the court characterized the testimony as speaking of the possibility of suicide in general terms, and insufficient to maintain a cause of action.

Appellant argues that the court improperly resolved disputed facts and "found" facts as evidenced in its ruling. Our review of the record indicates that, at the hearing on the motion, the following exchange took place.

Court: Let's take up the first issue. . . . That is whether . . . a wrongful death action can be maintained given the facts of this case. The history of the case that I assume counsel will agree with—and if you don't, I need you to let me know—is that there is a motor vehicle accident which occurs in 1994. The accident, . . . causes relatively minor damage to the vehicles involved. I believe I had heard the term in a number of different pleadings of somewhere in the area of $2,000.

Subsequent to that motor vehicle accident—I think it was a rear-ender, Mrs. Sindler, the party claiming to be injured in the case, claims that she sustained physical injury and claimed that she sustained mental injury.

[In] 1997 she files this suit, three years after the accident, within the statute of limitations, claiming the physical and mental injuries.

Seven years after the suit is filed Ms. Sindler commits suicide and claims that the injuries she sustained in the automobile accident of 1994 were a cause of her death, her

suicide, and therefore, she is entitled to maintain a wrongful death action in this case.

Now is there anything I said about those facts that are in dispute? Anybody dispute any of those facts?

Appellee's Counsel: I don't sir.

Appellant's Counsel: Just, your honor, that I believe that the damage was more than $2,000 to the vehicle.

The Court: How much?

Appellant's Counsel: I understand that, and I'm still requesting this information, it was approximately $6,000 to Ms. Sindler's vehicle.

Court: Well, that's the first time I've heard that; is that right?

Appellee's Counsel: Your honor, I honestly don't remember but the information that's been provided, if it's $6,000, it's $6,000. It was a great big old Cadillac. Damage was what it was.

Court: Does anybody dispute that Ms. Sindler was not— well, let me ask, was Mrs. Sindler an inpatient for physical injuries as a result of this accident?

Appellee's Counsel: No, Sir.

Appellant's Counsel: No, Your Honor.

The Court: So she was treated in the hospital and then released; is that right?

Appellant's Counsel: That's correct, Your Honor.

The Court: Anything else that's disputed about the facts that I stated?

Appellant's Counsel: No, Your Honor.

The Court: All right. Now, I'll hear what—well, before I hear from anybody, do you have any witnesses here today?

Appellant's Counsel: I do not, Your Honor. All that I have was the deposition—I mean the deposition testimony of Dr. Lefer who was Mrs. Sindler's treating psychiatrist at the time of her death[.]

Read in context, the court was determining whether its overall understanding was correct. The record makes clear

that the court considered the deposition transcripts made available to it before it determined that there was no dispute of a material fact and entered summary judgment.

The issue does not turn on the general recitation in the court's ruling. The determinative question is whether the depositions evidence a genuine dispute as to a material fact that would prevent the entry of summary judgment. We agree with the circuit court and conclude that they do not.

## *Applicable Law*

Appellees' main argument in support of their motion to dismiss appellant's wrongful death claim, in the circuit court and on appeal, is that suicide is not a legally cognizable basis for a wrongful death action in the absence of a special relationship between decedent and appellees.

Appellees assert that courts have held that suicide was not a legally cognizable basis for a wrongful death action because either (1) suicide was a *per se* bar, (2) it did not meet the requirements of Restatement(SECOND) of Torts § 455 (1977) (Restatement), or (3) suicide was a superseding intervening cause. Appellees urge us to adopt a rule that, under any theory, there can be no recovery for suicide as a matter of law when, as here, a party commits suicide approximately ten years after what initially appears as a non life threatening motor vehicle accident between persons having no prior relationship.

In a few decisions, courts have held that suicide is a common law crime and, as such, it is a *per se* bar to a wrongful death claim. *See, e.g., Wackwitz v. Roy,* 244 Va. 60, 65–66, 418 S.E.2d 861 (1992). To commit common law suicide, a person must: (1) take his own life; (2) be "of years of discretion;" and (3) be of "sound mind." *Id.* at 65, 418 S.E.2d 861. A person is of "sound mind" if competent and sane. *Hill v. Nicodemus,* 979 F.2d 987, 990 (4th Cir.1992). Thus, courts applying the *per se* rule analyze the question of liability for suicide by determining whether the person who took his/her own life was sane within the meaning of common law suicide. *See, e.g.,*

*Wackwitz,* 244 Va. at 65–66, 418 S.E.2d 861. If so, and the person is "of years of discretion," the person committed common law suicide, and any wrongful death claim is barred. *Id.*

The few Virginia and Fourth Circuit decisions to which appellees have directed us appear to adopt the "per se" rule set forth above. Crucial to the reasoning in these decisions, however, is that "suicide . . . remains a common law crime in Virginia." *See, e.g., id.* at 56, 418 S.E.2d 861. For example in *Brown v. G.W. Harris,* one of the cases cited by appellees, the Fourth Circuit explained,

> Under Virginia law, "[i]t is well settled that, as a general rule, 'a party who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequences of that act.'" *Wackwitz v. Roy,* 244 Va. 60, 418 S.E.2d 861, 864 (1992). As a result, the Virginia Supreme Court held in *Wackwitz* that, because suicide is a common law crime [in Virginia], it "precludes recovery for injuries sustained as a result of that act." *Id.* at 864.

240 F.3d 383, 386 (2001).

In *Brown,* the Fourth Circuit rejected the argument that "there was sufficient evidence in the record for the jury to conclude that Brown was of unsound mind," stating,

> In granting judgment as a matter of law on appellant's state claims, the magistrate judge correctly noted that it would be inappropriate to permit [the jury] to speculate that just because [Brown] had bipolar disorder that he was close to insan[e], that he had an unsound mind. Because appellant has failed to adduce any evidence that Brown was [insane] at the time he took his own life, we hold that the magistrate judge did not err in granting judgement as a matter of law to the appellees on appellant's state claims.

*Id.* at 387–88.

Based on *Wackwitz,* as explained in *Brown,* appellees argue that "appellants presented no evidence that Mrs. Sindler was of 'unsound mind' such that she would not be guilty of the

common law crime of suicide. Therefore, ... the fact of her alleged suicide bars the appellants' wrongful death claim as a matter of law." In making this argument, however, appellees have not acknowledged that it is questionable at best whether Maryland recognizes suicide as a common law crime. *See Wilmington Trust Company v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981) ("Suicide is no longer a crime either in England or the majority of American jurisdictions, and no American jurisdiction punishes a suicide through forfeiture of goods or any other means."); *Mayne v. State*, 45 Md.App. 483, 488, 414 A.2d 1 (1980)(declining to address "whether or not suicide is a crime in Maryland").

█ In contrast to the *per se* rule, the majority view is that suicide, as a consequence of a negligent act, is not legally cognizable under general principles of proximate causation, either because it is a superseding intervening cause or otherwise not a proximate cause.[6] Under Restatement § 455, however, liability is imposed upon a defendant for another's suicide when the defendant's negligent conduct causes the insanity of another and (1) the insanity prevents the person from understanding the nature of the act and the certainty of harm or (2) the insanity makes it impossible to resist an "uncontrollable impulse" that deprives the person of the capacity to govern the person's own conduct in a reasonable manner.

As the Court of Appeals noted in *Eisel*, 324 Md. at 381, 597 A.2d 447, there are two broad categories of cases in which a party may be liable for the suicide of another. One is when a party's conduct actually causes the suicide, and the other is when, because of a "special relationship," a party breaches a duty to prevent a foreseeable suicide. *Id.* While the same general principles of tort law apply to the two categories, the

---

**6.** *See, e.g., District of Columbia v. Peters,* 527 A.2d 1269, 1276 (D.C. 1987); *Edison v. Reproductive Health Services,* 863 S.W.2d 621, 627 (Mo.App.1994); *McLaughlin v. Sullivan,* 123 N.H. 335, 461 A.2d 123, 124 (1983); *see also* cases cited in Gregory G. Sarno, J.D., Annotation, 77 A.L.R.3d 311, *Liability of One Causing Physical Injuries as a Result of Which Injured Party Attempts or Commits Suicide* (2004).

analysis is different. In the first category, the focus is on the existence of a duty, and in the second category, the focus is on causation, assuming a duty and breach of that duty. The case before us falls into the first category.

The issue before us appears to be one of first impression in Maryland.[7] Neither appellees nor appellant have directed us to a single Maryland case endorsing a *per se* rule in this context. Regardless, we find the majority approach, based on principles of proximate cause, to be more persuasive. Thus, we decline to adopt a *per se* rule, and instead adopt the Restatement approach, which is simply a statement of proximate cause in a specific context.

Under the proximate cause analysis, the general rule is that "one may not recover damages in negligence for the suicide of another. The act of suicide is generally considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death." *E.g., Peters,* 527 A.2d at 1276 (citing *McLaughlin,* 123 N.H. at 337, 461 A.2d 123); *see also Cleveland v. Rotman,* 297 F.3d 569, 572 (7th Cir.2002) ("It is well-established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee."); *Watters v. TSR, Inc.,* 904 F.2d 378, 383 (6th Cir.1990) ("Generally speaking, it has been said, the act of suicide is viewed as 'an independent intervening act which the original tortfeasor could not have reasonably [been]

---

7. *Eisel,* 324 Md. at 389, 597 A.2d 447, relied on by appellant, is not on point. In *Eisel,* the Court of Appeals applied the special relationship doctrine and held that school counselors have a duty to use reasonable means to prevent suicide when they are on notice of a student's suicidal intent. *Id.* The issue was whether and when a duty exists to prevent suicide. The issue of causation, following an injury negligently inflicted, was not before the court. Additionally, in *Eisel,* the Court of Appeals did not endorse the New York case cited by appellants, *Fuller v. Preis,* 35 N.Y.2d 425, 363 N.Y.S.2d 568, 322 N.E.2d 263 (1974). Rather, the Court of Appeals merely referred to *Fuller* in describing the two broad catagories of cases in which a person may be held liable for a suicide. *Id.* at 381, 363 N.Y.S.2d 568, 322 N.E.2d 263.

expected to foresee.' " (Citations omitted)); *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286, 1292 (E.D.Mich.1981) ("If a person commits suicide in response to a mental condition, as distinguished from a mental illness, a prior tortfeasor, perhaps in part responsible for that condition, will not be liable because the act of the deceased is viewed as an independent intervening cause."); *accord Chalhoub v. Dixon*, 338 Ill.App.3d 535, 272 Ill.Dec. 860, 788 N.E.2d 164 (2003); *Bertrand v. Air Logistics, Inc.*, 820 So.2d 1228 (La.App.2002); *Dry Storage Corp., et al. v. Piscopo*, 249 Ga.App. 898, 550 S.E.2d 419 (2001).

■ The doctrine of proximate cause is well established in Maryland, and its general principles, as delineated by the Maryland courts, support the rule set forth above that generally suicide is an independent superseding act or, in any event, not proximately caused by the negligent act, which precludes imposing liability on a third party for the suicide of another.

■ The general principles of proximate cause under Maryland law are as follows. Two subparts comprise the element of proximate cause. "[T]he element of proximate cause is satisfied if the negligence is (1) a cause in fact of the injury and (2) a legally cognizable cause." *E.g., Wankel, et al. v. A & B Contractors, Inc., et al.*, 127 Md.App. 128, 159, 732 A.2d 333 (1999) (citing *Yonce*, 111 Md.App. at 138, 680 A.2d 569). Causation in fact raises the threshold question of "whether the defendant's conduct actually produced [the] injury." *Wankel*, 127 Md.App. at 158, 732 A.2d 333 (citing *Peterson v. Underwood*, 258 Md. 9, 16–17, 264 A.2d 851 (1970)). Maryland courts have employed two tests to determine whether cause in fact exists: the "but for" test and the "substantial factor test." *Wankel*, 127 Md.App. at 158, 732 A.2d 333 (citing *Yonce*, 111 Md.App. at 138, 680 A.2d 569).

■■ By its nature, the "but for" test applies when the injury would not have occurred in the absence of the defendant's negligent act. *Peterson*, 258 Md. at 16, 264 A.2d 851. The "but for" test does not resolve situations in which two independent causes concur to bring about an injury, and either

cause standing alone would have wrought the identical harm. *Yonce,* 111 Md.App. at 138, 680 A.2d 569.

The "substantial factor" test was created to meet this need but has been used frequently in other situations. *Yonce,* 111 Md.App. at 138, 680 A.2d 569 (citing Prosser & Keeton, Torts § 41 at 266 (2d Ed. 1955), quoted in *Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 208, 604 A.2d 445 (1992)). The substantial factor test is firmly rooted in the Restatement approach to proximate cause. The following sections of the Restatement are applicable:

§ 431. What Constitutes Legal Cause

The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in harm.

§ 433. Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

*Yonce,* 111 Md.App. at 138–39, 680 A.2d 569 (citing *Bartholomee v. Casey,* 103 Md.App. 34, 56, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995) (compiling Maryland cases utilizing the "substantial factor" test)).

If causation in fact exists, a defendant will not be relieved from liability for an injury if, at the time of the defendant's negligent act, the defendant should have foreseen the "general field of danger," not necessarily the specific kind of harm to which the injured party would be subjected as a result of the defendant's negligence. *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 337, 624 A.2d 496 (1993). As set forth in the Restatement:

§ 435. Foreseeability of Harm or Manner of its Occurrence

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

*Quoted in Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 157 n. 6, 642 A.2d 219 (1994).

The notion of foreseeability is also invoked in a determination of proximate cause when two or more non-simultaneous causes are at play. *E.g., Yonce,* 111 Md.App. at 140, 680 A.2d 569. The chain of causation may be broken by an intervening force (negligent or non-negligent) that may, in turn, become a superseding cause, in which case the original tortfeasor's liability will terminate. *Id.*

When more than one act of negligence arguably could be responsible for the injury, the question that is presented is whether the second in point of time superceded the first, i.e., did that act intervene and supercede the original act of negligence, thus terminating its role in the causation chain?

*Hartford,* 335 Md. at 157, 642 A.2d 219.

An intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence.

The connection between a defendant's negligence and the plaintiff's injury may be broken by an intervening cause. But in order to excuse the defendant, this intervening cause must be either a superceding or a responsible cause. It is a superceding cause, whether intelligent or not, if it so entirely supercedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury. It is a responsible one, if it is the culpable act of a human being who is legally responsible for such act. The defendant's negligence is not deemed the proximate cause of the injury, when the connection is thus actually broken by a responsible intervening cause. But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation.

*State ex. rel. Schiller v. Hecht Co.*, 165 Md. 415, 421, 169 A. 311 (1933).

 According to Restatement § 442, six factors should be evaluated when determining whether an intervening force rises to the level of a superseding cause:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Section 455 of the Restatement provides an important exception to the general rule that suicide is a superseding intervening act or, in any event, that the negligent act was not the legal or proximate cause of the suicide. *Peters,* 527 A.2d at 1275. The Restatement section assumes that negligent conduct caused delirium or insanity of another and addresses the question as to when the negligent actor is liable for suicide committed by the delirious or insane person. Under § 455,

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

Our search has uncovered no appellate decision in Maryland that has expressly adopted the Restatement section. The Restatement formulation of what is sometimes referred to as the "uncontrollable" or "irresistible impulse" test has been adopted by several other courts, however. *E.g., McLaughlin,* 461 A.2d at 124; *Baxter v. Safeway Stores, Inc.,* 13 Wash.App. 229, 534 P.2d 585, 587–89 (1975); *Fuller,* 35 N.Y.2d at 429, 322 N.E.2d 263. Insofar as we are informed, no appellate court has expressly rejected it.

Under the Restatement exception, "a plaintiff must show more than that the alleged negligent incident started a chain of circumstances that led to suicide." *Peters,* 527 A.2d at 1276. The plaintiff must prove that the defendant's action caused insanity, which prevented the decedent from realizing the nature of the act of suicide or resulted in the decedent's

having an uncontrollable impulse to commit suicide, "in the sense that the decedent could not have decided against and refrained from killing himself, and because of such uncontrollable impulse, the decedent committed suicide." *Id.* (quoting *Orcutt,* 364 P.2d at 1105).

In this regard, the comments to Section 455 are instructive. *"Comment on Clause (a)"* provides:

Clause (a) is applicable when the other's insanity is so extreme as to prevent him from understanding what he is doing or, if he understands what he is doing, from understanding its inevitable or probable consequences. It also applies to acts done during delirium.

Similarly, *"Comment on Clause (b)"* provides:

This Clause applies where the other's insanity does not deprive him of his capacity to realize the nature or consequences of his act or from forming a purpose to kill or cause harm to himself and selecting means appropriate to accomplish his purpose, but his act is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his actions. It, therefore, includes acts done under insane delusions if they are sufficiently strong to preclude resistance by such reason as his insanity leaves to the person laboring under them.

Finally, *"Comment d."* provides:

On the other hand, the fact that the actor's negligence causes harm to another which subjects him to recurrent attacks of extreme melancholia does not make the actor liable for death or other harm which the other deliberately inflicts upon himself during a lucid interval in an effort to terminate his life because of his dread of the increasingly frequent recurrence of these attacks.

Further, in discussing proximate causation in the context of liability for suicide, Dean Prosser explained:

Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to the contrary, it seems the better view is that when his insanity prevents him from realizing the nature of his

act or controlling his conduct, his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable. The situation is the same as if he should hurt himself during unconsciousness or delirium brought on by the injury. But if the suicide is during a lucid interval, when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supercedes the defendant's liability.

*Orcutt,* 364 P.2d at 1102 (quoting Prosser, Torts § 49 (2d Ed. 1955)).

## *Analysis*

In this case, whether Ms. Sindler was insane or delirious and that suicide resulted, not from her own voluntary conduct, but from lack of realization or an "uncontrollable impulse" that was the product of insanity created by appellees, was a jury question that required expert testimony. Appellant asserts that Ms. Sindler was suicidal. That is, of course, true but is merely the starting point of the analysis.

At the time of the ruling on the summary judgment motion, the evidence was insufficient to sustain a finding of liability for the suicide of Ms. Sindler under the Restatement. Dr. Gary Lefer is a practicing psychiatrist in New York City, who was identified by appellant as an expert witness. The record does not reveal with certainty whether Dr. Lefer's report was before the court at the time of the hearing on the motion for summary judgment. Appellant asserts that it was and relies on it. We shall consider it, although we observe that this is not a determinative issue because it adds little to his deposition testimony.

The report, dated February 16, 2004, and the deposition, taken April 12, 2004, may be summarized as follows. Ms. Sindler first consulted Dr. Lefer on January 21, 2002. Dr. Barbara Shapiro referred Ms. Sindler to Dr. Lefer for "evaluation of her depression." At that time, Dr. Lefer concluded

that Ms. Sindler had sustained a closed head injury as a result of the accident in question. He related symptoms reported by her as including pain, "insomnia," "alterations in her thought patterns," "scattered thinking, poor concentration, and increasing difficulty in carrying out normal activities of daily living," and "an increasing sense of depression and hopelessness." Dr. Lefer also related that Ms. Sindler admitted to episodes of "severe suicidal ideation," but stated that "I do not feel the patient poses an imminent suicidal risk." Dr. Lefer concluded there was no evidence of psychosis and described his "impression" as "depressive disorder in response to symptoms associated with her accident." Dr. Lefer referred Ms. Sindler to another physician for an opinion on the closed head injury and determined to treat the depression with cognitive behavioral therapy, psycho education, and possibly medications.

Subsequent to the initial consultation, Dr. Lefer met with Ms. Sindler on several occasions and spoke with her by phone. Dr. Lefer described Ms. Sindler's continuing symptoms and described his general awareness of at least some portions of Ms. Sindler's medical history prior to the accident in question, including episodes of anxiety and depression.

Dr. Lefer concluded his report by stating a diagnosis of "depressive disorder with episodes of suicidal ideation," which "appears to be in response to symptoms of insomnia, muscle pain and scattered thinking which developed following an injury sustained in 1994," "personality disorder-mixed," "closed head injury with insomnia, scattered thinking and poor balance," and "bilateral mastectomy."

In his deposition, Dr. Lefer testified that, at the time of the initial consultation, he did not think Ms. Sindler presented an active risk of suicide. A significant portion of the testimony addressed, in general, the possible relationship between closed head injuries, depressive disorders, and risk of suicide. With respect to Ms. Sindler, projecting into the future from the

date of the deposition, he stated that she would need someone such as himself to call to monitor her "suicidality" because "there's a significant risk that she'll take her life."

The deposition of Ms. Sindler was essentially a review of her medical history, including symptoms and treatment, before and after the accident in question. Ms. Sindler also discussed activities that she engaged in before the accident and restrictions after the accident. The bulk of the deposition was a description, in response to questions, of Ms. Sindler's complaints as of the time of the deposition and past, continuing, possible, or planned future treatment. We will not produce a complete summary, but as of July, 2002, Ms. Sindler testified that possible or planned future treatment would include right shoulder rotator cuff repair, an MRI of the left shoulder, myofacial release therapy, occupational therapy, cognitive speech therapy, auditory processing evaluation, orthopedic treatment, trigger point injections, botox treatment, evaluation of her sensitized nervous system, and treatment for severe gastric emptying. Ms. Sindler also testified that her symptoms discussed at the first portion of the deposition in April had not improved. These included pain, weakness, sleeplessness, dizziness, mood swings, difficulty with memory and concentration, earaches, medication sensitivity, headaches, intolerance to strong odors and bright lights, and fingernails that had become overly susceptible to breaking.

In summary, Dr. Lefer testified that Ms. Sindler exhibited organic brain syndrome that caused depression. He also indicated that she was a suicide risk. Obviously, given the date of his report and deposition, he could not have and did not opine that the suicide was caused by the accident. Moreover, Dr. Lefer did not opine that Ms. Sindler was insane or otherwise was in a mental state such that she did not realize the nature and risk of her act of suicide or that she had an uncontrollable impulse or anything sufficiently close to the Restatement test to create a jury question. As such, we affirm the circuit court's order granting summary judgment to appel-

lees on the wrongful death claim.[8]

## *Dismissal*

Appellant contends the court erred in dismissing appellant's case based on discovery violations. Specifically, appellant argues (1) the court exceeded its authority with respect to the Sindlers' failure to answer interrogatories and to submit to re-deposition because appropriate orders had not been entered compelling answers/permitting the re-deposition, (2) the court was mistaken as to important facts, (3) it is not clear the court exercised discretion as it is required to do, and (4) Ms. Sindler's failures of discovery could not be used against Dr. Sindler. As explained below, we perceive neither error nor abuse of discretion.

## *Standard of Review*

Maryland law is well settled that trial courts have "broad discretion to fashion a remedy based on a party's failure to abide by the rules of discovery." *Warehime v. Dell*, 124 Md.App. 31, 43, 720 A.2d 1196 (1998) (citing *Bartholomee*, 103 Md.App. at 48, 651 A.2d 908); *Hossainkhail v. Gebrehi-*

---

8. In the reply brief, appellant suggests that the court erred in denying appellant's motion for reconsideration. Appellant does not so contend, however, because the issue was not argued in the original brief and, under the Maryland Rules and case law, cannot be raised in the reply for the first time. Moreover, when raised in the reply brief, the issue is not raised as an argument as the Maryland Rules require. Nevertheless, were we to consider the argument, we would not conclude the court abused its discretion because appellant had ample opportunity to produce evidence at the August 4 hearing and was expressly asked if he had any additional evidence to present. Counsel did not state that Dr. Lefer was unavailable, that an affidavit was being obtained, or that any additional evidence was being sought. The motion for reconsideration itself offers no reason for the late material. Appellants had ample opportunity to present evidence before the summary judgment hearing, and the circuit court expressly pointed that out to counsel. Additionally, there was a substantial history of lack of diligence on the part of the Sindlers, and it was proper for the circuit court to consider appellant's diligence in denying the motion for reconsideration. Finally, appellant asserts that the court should not have considered the Wellness seminar announcement. Appellant did not object to its admissibility at the time of the hearing, however.

*wot,* 143 Md.App. 716, 725, 795 A.2d 816 (2002). In order to impose sanctions, a court need not find willful or contumacious behavior. *Warehime,* 124 Md.App. at 44, 720 A.2d 1196. Rather, in imposing sanctions, a trial court has "considerable latitude." *Id.* (citing *Miller v. Talbott,* 239 Md. 382, 387, 211 A.2d 741 (1965)).

 Our review of the trial court's resolution of a discovery dispute is quite narrow; appellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery. *Warehime,* 124 Md.App. at 44, 720 A.2d 1196. Accordingly, we may not reverse unless we find an abuse of discretion. *Id.* In *Mason v. Wolfing,* 265 Md. 234, 236, 288 A.2d 880 (1972), the Court stated: "Even when the ultimate penalty of dismissing the case or entering a default judgment is invoked, it cannot be disturbed on appeal without a clear showing that [the trial judge's] discretion was abused." *See also Klupt v. Krongard,* 126 Md.App. 179, 201, 728 A.2d 727 (1999); *Warehime,* 124 Md.App. at 44, 720 A.2d 1196; *Lone v. Montgomery County,* 85 Md.App. 477, 485, 584 A.2d 142 (1991); *Berkson v. Berryman,* 63 Md.App. 134, 142, 492 A.2d 338 (1985).

 As the Court of Appeals has stated,

There is an abuse of discretion "where no reasonable person would take the view adopted by the [trial] court[ ]" . . . or when the court acts "without reference to any guiding rules or principles." An abuse of discretion may also be found where the ruling under consideration is "clearly against the logic and effect of facts and inferences before the court[ ]" . . . or when the ruling is "violative of fact and logic." In sum, to be reversed "[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable."

*Wilson v. Crane,* 385 Md. 185, 198–99, 867 A.2d 1077 (2005) (quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13, 701 A.2d 110 (1997)(internal citations omitted)).

(1)

Appellant observes that a court may not award sanctions for incomplete discovery unless the discovering party first files a motion to compel and obtains an order compelling discovery. Appellant argues that this is the situation with respect to the Sindlers' incomplete answers to interrogatories.

On September 14, 1998, appellees propounded written discovery to the Sindlers, including interrogatories. By order dated October 7, 1998, the court granted the motion to compel and ordered responses to be filed within 10 days. The Sindlers did not comply with that order. Beginning some time later, the Sindlers informally produced information from time to time, but they never provided executed answers to interrogatories.

Under these circumstances, the circuit court had the authority to impose sanctions. *See* Md Rules 2–432 and 2–433. Its action is subject to an abuse of discretion standard. *E.g., Hossainkhail,* 143 Md.App. at 725–27, 795 A.2d 816; *Lone,* 85 Md.App. at 477, 584 A.2d 142.

The following factors, which often overlap, are used to guide a trial court's consideration of discovery sanctions: (1) whether the disclosure violation was technical or substantial; (2) the timing of the ultimate disclosure; (3) the reason, if any, for the violation; (4) the degree of prejudice to the parties respectively offering and opposing the evidence; and (5) whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. *E.g., Hossainkhail,* 143 Md.App. at 725–26, 795 A.2d 816 (citing *Taliaferro v. State,* 295 Md. 376, 390–91, 456 A.2d 29 (1983)).

In *Hossainkhail,* 143 Md.App. 716, 795 A.2d 816 (2002), this Court affirmed the circuit court's dismissal of an injured motorist's negligence claims for failure to abide by discovery deadlines. In that case, we found that the motorist's failure to timely respond, to both the discovery deadlines and the trial court's express order compelling discovery, was without good cause and prejudiced the defendants, thus supporting the trial court's dismissal of the action. *Id.* at 726, 795 A.2d 816.

Additionally, we pointed out that the sole reason for the delay was attributable to the motorist, who "summarily attributed his absence to personal problems but made no showing why he could not and did not keep in touch with counsel when he obviously knew he had a case pending." *Id.* In light of the facts, we concluded that the court was entitled to "grant little weight to appellant's unsupported explanation for the delay." *Id.* (citing *Lone,* 85 Md.App. at 486, 584 A.2d 142).

Similarly, in *Warehime,* 124 Md.App. 31, 720 A.2d 1196 (1998), we held that the trial court did not abuse its discretion in dismissing a complaint as to a defendant whose interrogatories had gone unanswered for 90 days beyond the deadline, after the case had seemingly languished for almost five years, virtually no discovery had been undertaken, and the propounder of interrogatories had made several efforts to procure answers. *Id.* at 48–49, 720 A.2d 1196. We explained:

We observe, first, that appellants' failure to answer interrogatories was a substantial, not a technical, discovery violation. This case had seemingly languished for almost five years, and is altogether unlike *Hart v. Miller,* 65 Md.App. 620, 501 A.2d 872 [(1985)], *cert. denied,* 305 Md. 621, 505 A.2d 1342 (1985) [(1986)]. There, we determined that the trial court abused its discretion when it dismissed a case for failure of discovery, because "[w]hat remained to be done [in discovery] was trivial in comparison to what had already been undertaken." *Id.* at 628, 501 A.2d 872. But in this case, it was not as if appellants had diligently complied with numerous or burdensome discovery requests, so that one oversight should be overlooked. To the contrary, virtually no discovery had been undertaken by the parties, and Dell made several efforts to procure answers to his interrogatories.

Furthermore, contrary to appellants' assertion, the trial court was not required to conclude that appellants' failure to answer the interrogatories did not prejudice Dell in his defense of the lawsuit. The purpose of discovery is to "eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of

mind, concerning facts that gave rise to the litigation."
Interrogatories are often the most expeditious and least
expensive way for a litigant to ascertain the witnesses and
documents that will be important in an impending trial.
*Id.* (internal citations omitted).

 In this case, appellant's discovery violations were
substantial. In fact, the Sindlers never provided executed
answers to interrogatories. Appellant had a duty to move the
case forward, *Shelton v. Kirson,* 119 Md.App. 325, 332, 705
A.2d 25 (1998), and continuously shirked this duty. Addition-
ally, in the end, appellant did not offer an adequate explana-
tion for the Sindlers' repeated and ongoing failures to provide
complete discovery.

Appellant also observes that a court may not impose sanc-
tions for failure to appear for a deposition if the party had
been previously deposed and leave of court had not been
obtained. Appellant argues that such a situation is presented
in this case because the circuit court never entered an order
permitting the re-deposition of Ms. Sindler.

Md. Rule 2–411 provides that "[l]eave of court must be
obtained to take a deposition ... of an individual who has
previously been deposed in the same action." In *Melnick v.
New Plan Realty Trust,* we applied Rule 2–411 and held that
the judgment creditor was required to obtain leave of court to
re-depose the judgment debtor. 89 Md.App. 435, 438–39, 598
A.2d 787 (1991).

This rule applies to compelling a re-deposition when the
party refuses to consent. In this case, the record supports a
conclusion that counsel for the Sindlers repeatedly agreed, in
2003 and 2004, to make the Sindlers available for re-deposition
but failed to follow through. Appellees were entitled to rely
on that consent. For example, by letter dated January 21,
2004, the Sindlers' counsel advised that the Sindlers would be
available for depositions "beginning next week for the next
month with the exception of February 6, 2004." According to
the affidavit by a legal assistant in the office of counsel for
appellees, referred to above, there were various efforts to

schedule the depositions after January. After receiving no response as to specific dates, counsel, on June 15, noted the depositions for July 6 and 7. According to the affidavit, an assistant in the office of counsel for the Sindlers called the affiant and requested that Ms. Sindler's deposition be taken on July 7 and Dr. Sindler's deposition be rescheduled. On July 1, 2004, counsel received a letter dated June 30 from the Sindlers' counsel objecting, for the first time, on the ground that the Sindlers had been deposed in 2000.

As the circuit court observed, there was ample basis, because of the extensive course of treatment, for re-deposing the Sindlers. The Sindlers did not revoke their consent until it was too late to file a motion, obtain an order, and re-depose Ms. Sindler. Subsequently, appellees did file a motion, obtain an order, and re-depose Dr. Sindler.

Ordinarily, a discovering party must pursue available remedies to obtain discovery or the party will not be heard to complain. It is also true, however, that courts encourage parties to resolve discovery issues without court intervention. Under the above circumstances, given the agreement of counsel, the court had the authority to consider the failure of Ms. Sindler to appear for re-deposition as part of its consideration of appellees' motion to dismiss.

(2)

Appellant, speaking generally, argues that a court abuses its discretion in granting sanctions when the factual basis for its decision is not correct or is contradicted by the record. Appellant asserts that the court in this case erroneously believed (1) that "the record of the January 22, 2004 hearing would reflect that Mrs. Sindler was willful on the issue of her re-deposition," (2) there was a July 5, 2004 deadline for taking the deposition, and (3) that Ms. Sindler committed suicide, in Tucson, Arizona, on the day she was scheduled to be deposed in Maryland.

Appellant relies on the following. Counsel who represented the Sindlers through the trial first entered an appearance in

November, 2003. Shortly thereafter, counsel for the Sindlers served supplemental expert witness lists. Appellees filed a motion for protective order, and the court held a hearing on January 22, 2004. The transcript of the hearing reveals that, among the items discussed, was the identity of experts and postponement of the then trial date because the Sindlers' counsel was pregnant, with expected delivery shortly before the scheduled trial date. There was no discussion of the re-deposition of Ms. Sindler.

At the hearing on appellees' motion to dismiss on August 4, 2004, and again after the close of evidence at trial, the court stated its recollection that the record would reflect that the re-deposition was discussed at the January hearing and that Ms. Sindler would voluntarily appear for deposition. At the hearing on post-trial motions on October 4, 2004, the court recalled that it had ruled that Ms. Sindler had to be re-deposed by a date certain and that everyone knew it had to be given by July 5. At the same hearing, the court observed that Ms. Sindler committed suicide in Arizona on the same day she was to be deposed and thus had no intention of giving a deposition in Maryland.

Appellant concludes that the court was in error in recalling a discussion of the deposition at the January 22, hearing, because the transcript does not reveal such a discussion; was in error in recalling that a date certain had been set for the re-deposition because there is nothing in the record to indicate that; and was in error in recalling that the re-deposition was scheduled for July 5 when, in fact, it had been scheduled for July 7.

Our review of the record, particularly the discussion at the August 4 and October 4 hearings, indicates that the court was clear and accurate with respect to the substance of its recollection, i.e., counsel for the Sindlers, who entered an appearance in November, 2003, had consented to a re-deposition, and it was scheduled for early July. The court was either mistaken as to when the discussion about the re-depositions occurred and/or that it occurred on, rather than off, the record. The

court was also mistaken that there was a July cutoff date, on the record, with respect to the deposition of Ms. Sindler and the agreed date on which it was scheduled.

The mistakes were not material to the court's reasoning, however, and therefore, the principal case upon which appellants rely is distinguishable. In *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 62–63, 680 A.2d 480 (1996), the trial judge dismissed the case based on a violation of an order to produce privileged documents. The Court of Appeals reversed, finding that the trial court's dismissal was based on the erroneous conclusion that the privileged documents were material to the case. The Court held that, "[b]ecause facts that the [trial] court considered to be material were based on clearly erroneous findings, violation of the order to produce the privilege log documents cannot be used to support the sanction of default[.]"

In this case, the circuit court's mistakes were not material to its decision to dismiss the case. We set forth the court's comments in full.

> It's almost inconceivable to me how you can sit here and tell me that there was not an agreement which you acknowledged that Barbara Sindler would give her deposition by a date certain, that it was required. We had discussions about it. We talked about the fact that the Defense wanted to take her deposition. We had a hearing in that regard where you opposed it, you said that she already gave a deposition, and I ruled specifically that Barbara Sindler had to give her deposition and it was by a date certain. The date was July the 5th after the first postponement that we had. That's when I got involved in the case. And you said to me, in this chambers, Barbara Sindler will give this deposition.
>
> For you now to come in here and tell me there was no mention of a deposition is almost mind boggling to me, it really is. How can you say that to me that you have no recollection of the fact that her deposition was to be taken,

it was to be taken by a date certain, [it] is really hard for me to accept that that's what your saying to me.

In fact, Barbara Sindler didn't give the deposition. There were—how would I know that there were approximately four prior depositions sought of Barbara Sindler, four dates set which were either cancelled by her or changed by the lawyers that were representing her? I wouldn't know that unless we had this kind of discussion, and there's no question in the Court's mind that we did have that discussion, that there was that agreement that she would give it, because the defense did not know what Barbara Sindler would say what her position was in regard to the treatment that she had gotten for about four years prior to her death, which by the way made up the vast majority of damages that were testified to in the trial before us. So I find it very difficult to accept that statement that there wasn't such an agreement, because there was, there absolutely was. I can state for a fact that there was.

It was troubling to me, and I expressed that trouble on the record, that here a Plaintiff is claiming damages, and the basis of the plaintiff's damages are not something that is objective, it's subjective, and that the basis of the experts for the Defense testifying as they did was in great part the statements made to the experts by Barbara Sindler. The history that she gave to the experts in this case allowed them to formulate the opinions which they gave. This is not a situation where somebody has a broken bone and an expert can look at the x-ray and see the broken bone. The basis of the diagnosis made by the experts for the Plaintiff was in greatest measure what she told them, what she told them her history was. And it was of concern to me, as I expressed in the motion to dismiss that I reserved upon, the fact that the defense never had the chance to ask Barbara Sindler under oath about the things she said to the experts that made up the basis of their opinions.

It's just basic fairness that if, in fact, a Plaintiff wants to make a claim and that claim is based on what they have told other people, that what they told other people be allowed to be cross examined, be allowed to be tested, be allowed to be

inquired into so that the truth or the falsity about those statements can be explored.

In the past four years prior to this trial, Barbara Sindler never provided sworn-to statements either in the form of interrogatories—which by the way were required under the Maryland rules to be updated—clearly the damages that were testified to in this trial were damages in large part incurred in the last four years, nowhere were those damages ever sworn to by [Mrs.] Sindler. Never in the last four years has Mrs. Sindler under oath said anything, and yet under the General Rules of Evidence Mrs. Sindler's statements to her treating physicians would be admissible in a court because they're an exception to the Hearsay Rule. But for those statements to come, that evidence to form the basis of her experts' opinions without the other side having the chance to inquire into those statements, to inquire as to the truth of those statements, to inquire as to the basis of those statements, to inquire as to whether what Barbara Sindler told those physicians was, in fact, true or not, and to inquire of Barbara Sindler about that seems to me to be basically unfair.

Everyone knew that Barbara Sindler's deposition had to be given by July the 5th. July the 5th Barbara Sindler kills herself before the deposition and, quite frankly, had no intention of giving a deposition—at least one would think because she was in Arizona and everybody else is here with no plans in the works for the taking of a deposition. So far for the time I have been involved in the case, which was the fall of 2003 until July the 5th of 2004 when she killed herself, the request was made continually that Barbara Sindler give a deposition, that she submit to questioning under oath. And it was agreed that she would give such a deposition, not by her, because [ever] since I became involved in this case in the fall of 2003, Mrs. Sindler has never appeared in this courthouse, as far as I know. But her attorney told me that she would give such a deposition and, in fact, she didn't. And, in fact, she's never submitted to questioning under oath, and the very nature of this case made such questioning imperative.

It seemed to me that it was basically unfair to let a plaintiff proceed with a case alleging the injuries that she did and not be subjected to a testing of the statements she made to the physicians to support the claim.

Now, at the motion to dismiss, I reserved ruling on the motion, and quite frankly the reason I reserved ruling on the motion was to let the jury decide the case and have that as a matter of record so that if the decision I made in regard to the motion to dismiss was inaccurate, wrong, then the verdict would be before the appellate court, and the case wouldn't have to be retried. The case, it seemed to me, had been going on in the courts for too long a period of time for me to rule on the motion to dismiss to have that possibly reversed and then have to come back and start all over again.

Well, the case went to the jury. The jury rendered their verdict. What I said during the trial to Ms. Chiaravalloti and to counsel, it's on the record, really exemplified the reasons why this, it seemed to me, to just be unfair to allow a Plaintiff's words to come in before the jury, to have a Plaintiff's complaints come in before the jury, and the Defense having no opportunity to question the Plaintiff about those complaints, to have no opportunity to test the accuracy of what the Plaintiff was complaining about to the physicians. It seemed to me that was just basically unfair. Now, whether Ms. Sindler killed herself or whether she didn't, the fact of the matter is that on the day that was the deadline for the taking of the deposition, she hadn't given a deposition and apparently had no plans to give one.

Clearly, the court's decision was premised, in large part, on Ms. Sindler's failure to provide sworn information for four years despite numerous physical and mental complaints and continuing treatment with numerous health care providers. We perceive no error in the court's decision to dismiss the case.

(3)

█ Appellant contends the record does not indicate that the court in fact exercised its discretion. Suffice it to say that

the court, on several occasions, expressed its dismay with respect to discovery, notably in August, at trial, and on October 4. The court reserved on the motion to dismiss, and clearly considered whether rulings on other motions to exclude evidence offered by appellant, not herein summarized, would prevent undue prejudice. Ultimately, the court concluded that dismissal was the appropriate remedy. The court did exercise its discretion.

### (4)

Appellant contends that Dr. Sindler, individually, was improperly sanctioned because of Ms. Sindler's conduct. The short answer is that a loss of consortium claim is not an individual's claim, but a joint claim. We perceive no merit in this argument.[9]

### *Judgment Notwithstanding The Verdict*

Appellant contends the court erred in granting appellees' motion for judgment notwithstanding the verdict.

At the October 4, 2004 hearing, the court stated:

---

9. Appellant, in its argument relating to the motion to dismiss, referenced the request for admissions filed by appellees. Appellant observed that the request was filed on June 4, 2004, and that a response was not due until July 7. We interpret appellant's comments as suggesting that the court ruled that the requests were deemed admitted before the response time had elapsed. The record does not support such an assertion. The record indicates that appellant, at no time prior to trial, filed a motion for extension of time, a motion to withdraw deemed admissions, or a motion seeking other relief with respect to the request for admissions. On the first day of trial, the parties argued several motions *in limine*. One of the motions was a motion *in limine* by appellees seeking a ruling that the request for admissions and referenced medical reports was admissible into evidence. That motion was granted on September 8, the first day of trial. The reference in the record, relied on by appellant, relates to the hearing on September 8.

Appellant does not argue the evidentiary ruling as a separate basis for reversible error. The court did not refer to, and apparently did not rely on the timeliness of any response to the request for admissions in ruling on the motion to dismiss. Thus, the request for admissions is not directly relevant to the issues on appeal.

It seems to me that it's just basically unfair to allow a plaintiff to do this, and it's for that reason that the court grants the motion for judgment of JNOV, orders the clerk to enter judgment in favor of the ... defendants for costs.

The court would grant, in addition, the motion to dismiss that it reserved upon at the hearing in August.

Now, procedurally, whether it is a motion JNOV, or whether it is the granting of the motion to dismiss under Rule 2–433(a)(3) or 2–433(b) which is failure to comply with an order compelling discovery, I don't think it matters much, because as far as I'm concerned it's all of those things. And for that reason, the motion is granted. The clerk is instructed to enter the judgment JNOV, and now we're right for everybody to go up to the Court of Special Appeals. So that's it.

It is clear the court granted both the judgment notwithstanding the verdict and the motion to dismiss. The court erred in granting the motion for judgment notwithstanding the verdict because there was legally sufficient evidence to sustain the verdict. The error was harmless, however, in light of its ruling on the motion to dismiss and our disposition of that motion.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**